14 Cal.Rptr. 25, 363 P.2d 25]

[L. A. No. 25637. In Bank. May 29, 1961.]

SCANDINAVIAN AIRLINES SYSTEM, INC. (a Corporation), Respondent, v. COUNTY OF LOS ANGELES et al., Appellants.

( 11 )

12

14

Harold W. Kennedy, County Counsel, and Alfred Charles De Flon, Deputy County Counsel, for Appellants.

Musick, Peeler & Garrett, Elvon P. Musick, Roderick M. Hills, Richard D. Esbenshade and Kenneth E. Scott for Respondent.

Condon & Forsyth, Darling, Shattuck & Edmonds, Cyril H. Condon, Hugh W. Darling, Rodolphe J. A. de Seife, Graham, James & Rolph, Robert D. Mackenzie, Foley, James & Conran, Frank J. Foley, James J. Conran, Pillsbury, Madison & Sutro, Turner H. McBaine, Noel Dyer, Chapman, Walsh & O'Connell, Joseph J. O'Connell, Jr., and Arthur K. Mason as Amici Curiae on behalf of Respondent.

PETERS, J.—Defendants, the county of Los Angeles and the city of Los Angeles, have appealed from a judgment requiring them to refund to the plaintiff certain personal property taxes which were levied against plaintiff's foreign owned and based aircraft flown exclusively in foreign commerce, and which utilized Los Angeles International Airport as their sole United States terminus. The United States Supreme Court, and the highest courts of the several states, have spoken with apparent finality regarding the right to tax and the method of taxation of ocean-going vessels engaged in both foreign and interstate commerce, and the courts have

had occasion to determine similar questions involving aircraft engaged solely in interstate commerce (*Northwest Airlines* v. *Minnesota*, 322 U.S. 292 [64 S.Ct. 950, 88 L.Ed. 1283, 153 A.L.R. 245]; *Braniff Airways, Inc.* v. *Nebraska State Board of Equalization*, 347 U.S. 590 [74 S.Ct. 757, 98 L.Ed. 967]; *Slick Airways, Inc.* v. *County of Los Angeles*, 140 Cal.App.2d 311 [295 P.2d 46]), and domestically owned and based airplanes engaged in foreign commerce (*Flying Tiger Line, Inc.* v. *County of Los Angeles*, 51 Cal.2d 314 [333 P.2d 323]). However, the precise problem presented here, wherein the airplanes sought to be taxed locally are: (1) foreign owned, (2) foreign based and registered, and (3) flown solely in foreign commerce with but a single United States port, has not as yet, insofar as we have been advised, been passed on by the appellate courts.

The facts are undisputed. Defendants' general demurrer to plaintiff's complaint was overruled, and the parties then stipulated that the material facts of the complaint be taken as true, that judgment be entered in favor of plaintiff, without necessity of further proof, and that defendants retain their right to appeal from such judgment. The following is a summary of the material allegations of the complaint:

1. Plaintiff operates an air line, solely in foreign commerce, between Copenhagen, Denmark, and Los Angeles, California. All of its airplanes are owned, based and registered in one of three Scandinavian home ports.[1] The service referred to is rendered under a permit granted by the United States Civil Aeronautics Board. The planes stop en route in Canada, but touch the United States only at Los Angeles International Airport.

2. During the period involved herein each of plaintiff's airplanes averaged eight round-trip flights per year, and remained at its Los Angeles terminus for less than 34 hours on each flight.[2]

---

[1] For the purpose of this decision, plaintiff may be considered as the operator and owner of the mentioned airplanes. Actually, plaintiff is but the United States representative of a consortium of Danish Airlines, Swedish Airlines and Norwegian Airlines. The airplanes are individually owned by the respective members of the consortium, and are registered and based in Copenhagen, Stockholm and Oslo, respectively. For the purpose of their United States flights, the European terminus of each is Copenhagen.

[2] Although the complaint is silent in regard to the use to which each airplane is put during the balance of the year, it may be assumed that by far the greater portion of such period is devoted either to maintenance

3. None of the planes was physically present in Los Angeles (or in the United States) on the first Monday of March in the year for which taxes were levied.

4. Defendant County of Los Angeles assessed each of the airplanes upon an "apportionment" basis, by means of a formula which was intended to determine that portion of the airplane's value measured by the period during which it was physically present in the county. Such formula added one hour "flying time" per trip, to the actual time spent on the ground in Los Angeles, and divided this figure into the total hours in the tax year. Based upon the assessment so calculated, defendant county levied a personal property tax on each of the airplanes on its own behalf, and upon behalf of the defendant city.

5. During the period for which defendants levied such tax, each of the airplanes was taxed, on an unapportioned basis, in its home port.[3]

6. No foreign country levies a property tax on aircraft operated by any United States air line flying planes in foreign commerce.[4]

7. The taxes levied by defendants constitute double taxation.

8. Plaintiff's operations in making the Copenhagen-Los Angeles flights are subject to extensive regulation by the United States government (17 specific regulatory measures being alleged), and the United States is party to 19 separate, and specifically alleged, international treaties directly or indirectly regulating and affecting such operations.

9. Plaintiff paid the taxes demanded by defendants, under protest, and subsequently filed a claim for refund.

The pleadings raise no issue regarding the propriety of the procedures taken on the claim for refund, and plaintiff does not question the formula by which defendants "apportioned" the tax. Hence the sole question involved is the validity of the tax.

---

at its home port, to local transportation in its home country, or to international transportation in which California is not involved.

[3]Denmark, Sweden and Norway each taxed the "operations" of their respective nationals which operated airplanes based in those countries, and Norway levied a property tax on the entire value of those planes which were registered and based in Oslo.

[4]Although not alleged in the complaint, it is argued by respondent, and not denied by appellants, that such reprisal taxation is now being threatened in several foreign countries.

Because of their interest herein, most of the foreign airlines serving California have filed amici curiae briefs.

*Contention of the Parties:*

In support of the judgment, plaintiff contends that: (1) the commerce clause of the United States Constitution prohibits the levy of this tax; (2) the tax is further prohibited by the due process clauses of both the federal and California Constitutions; and, (3) there is no California statutory basis for this taxation.

In support of its first contention—conflict with the commerce clause—plaintiff makes a three-fold argument. First, it claims that since there is no relevant distinction between aircraft flying the international skies and ocean-going vessels plying the high seas, the former should be subjected to the same "home-port" doctrine of taxation which the United States Supreme Court has applied to the latter. Second, plaintiff claims that taxation of aircraft based and owned in a foreign country is a matter of international concern within the exclusive jurisdiction of the federal government (citing various federal regulatory acts and international treaties alleged to control). Its final argument in regard to the commerce clause is that "apportioned taxation" by California, together with unapportioned taxation by the government of the aircraft's home port, conflicts with the commerce clause in that it imposes double taxation, and places a far heavier burden upon such foreign aircraft than exists in the case of aircraft owned domestically.

Plaintiff bases its second contention—repugnancy to the due process clauses—upon the claim that its airplanes have not acquired a taxable situs in California.

Its third contention is predicated upon the argument that California's constitutional and general statutory provisions for taxation of the various forms of personal property do not contemplate the taxation of aircraft owned and based in foreign countries and engaged in foreign commerce, and that without specific legislative authority these defendants are without jurisdiction to levy this tax.

Defendants contend that the commerce clause is inapplicable on several grounds. The first is that although that clause gives Congress the exclusive power to regulate commerce, such power is not denied to the several states until Congress has preempted the field, which defendants claim has not been done. The second is that taxation of personal property does not

fall within that class of subjects which "admit only of one uniform system, or plan of regulation," which phrase has been applied as the test for exclusive legislation by the federal Congress. Defendants also claim that the decisions of the United States Supreme Court indicate a trend away from the "home-port" doctrine of taxation, and that if the question were to be submitted to that court today it would repudiate its former rule. As a final reply to the contention that the commerce clause prohibits the instant tax, defendants argue that instrumentalities of commerce, by their very nature, acquire more than one taxable situs, and that the undue burden on commerce which would otherwise be imposed is properly avoided by a system of apportioned taxation in each such situs; that the undue burden, if any, imposed on the instant aircraft is not the result of defendants' apportioned tax, but results from the fact that the domiciliary situs has levied taxes on the full value.

Replying to plaintiff's contention that the due process clauses prohibit this tax, defendants contend that the sole test, insofar as due process is concerned, is whether the proposed tax has reasonable relation to the opportunities, benefits or protection conferred or accorded by the taxing state. Defendants then point out that an apportioned tax, based solely upon the percentage of time which the property is actually within the County of Los Angeles, satisfies this test.

In meeting plaintiff's third and last contention (lack of statutory basis for the tax) defendants argue that the California Constitution fixes the liability of the property to taxation and the standard upon which it is based (i.e., in proportion to its value),[5] and that the only further requirement is that the Legislature provide the machinery by which to ascertain such value (citing *McHenry* v. *Downer,* 116 Cal. 20 [47 P. 779, 45 L.R.A. 737], and *Crocker* v. *Scott,* 149 Cal. 575 [87 P. 102]). How, or in what manner, the Legislature has met this further requirement is not spelled out in defendants' briefs.

*The "Home-Port" Doctrine:*

As stated above, plaintiff's main contention in support of the judgment is that the tax imposed by defendants violates

[5]Article XIII, section 1, provides: "All property in the State . . . not exempt under the laws of the United States, shall be taxed in proportion to its value . . . ."

the commerce clause of the United States Constitution. Its first point in support of this contention is that the United States Supreme Court has clearly prohibited such state taxation in a line of decisions enunciating the "home-port" doctrine. By a series of opinions, covering a period of over a hundred years, that court has developed a body of law dealing with the power of local authorities to levy property taxes on instrumentalities of commerce which are transitory in character, and, in the course of engaging in trade, come within the territorial limits of one or more of the states of the Union. In each of the decisions embraced in that body of law, the United States Supreme Court has emphasized the importance of the true domicile, the port of registration, or home port, of the particular instrumentality sought to be taxed. It should be noted that in determining the validity or invalidity of a particular tax in light of this doctrine, the Supreme Court has not confined itself to a discussion of the commerce clause, but has also predicated its decision on the impact of the due process clause on such taxation.[6] But if a decision in this case is controlled by principles heretofore announced by the federal courts, it makes little difference whether those principles were predicated upon one constitutional ground or another. The task with which we are faced was well stated in the Northwestern Airlines opinion (*supra*) as follows: "The answer involves the application of settled legal principles to the precise circumstances of this case." Thus, it is our duty to determine what "settled legal principles," if any, are applicable to the tax here under consideration. If that determination leads to the conclusion that the "home-port" doctrine is applicable herein it is our duty to so declare, not only because the United States Supreme Court has spoken with finality in a field which is peculiarly federal in nature, but because such principles have been definitely settled, and should

[6]The earlier decisions dealing with the "home-port" doctrine appear to be based upon the commerce clause, in that they refer to an area of commerce subject to the "laws of the general government, to which belongs the regulation of commerce with foreign nations and between the states." (*Hays* v. *Pacific Mail Steamship Co.*, 17 How. (U.S.) 596 [15 L.Ed. 254].) Subsequent decisions, as will be noted below, base the doctrine squarely upon the due process clause by reason of lack of taxable situs in the taxing state. Still later, in *Northwest Airlines* v. *Minnesota*, *supra*, 322 U.S. 292, the court held the question to involve both the commerce and the due process clauses, and failed to indicate clearly on which the decision was predicated. See *State Taxation of International Air Transportation*, 11 Stan.L.R. 518, at p. 520.

not be overruled except for most compelling reasons which do not here exist. It should also be noted that the basic principles which will determine the applicability or inapplicability of the "home-port" doctrine have been enunciated by this court as well as by the United States Supreme Court.

A reading of both the federal and state cases on the subject demonstrates that both courts have considered the subject to embrace a federal question without reference to any theory that it becomes such only when Congress pre-empts the field by enacting legislation. In fact, the basic decisions (both federal and state) have declared the "home-port" doctrine (and hence the invalidity of a proposed tax) although the federal legislature has never spoken on the subject. Inherent in the opinions, even when unstated, is a concept of the dual nature of a port of entry. Thus, Los Angeles International Airport is, on one hand, an integral portion of the city, county and state, subject to the sovereign powers thereof, and on the other hand is a port of entry to the United States. ▮ In its latter capacity its actions must be viewed as they may affect commerce with foreign nations. Such view poses federal questions even in the absence of Congressional enactment.

As early as 1851 taxing authorities in California attempted to levy property taxes on vehicles of commerce that touched temporarily in the various ports of this state. In 1854 the United States Supreme Court held, in *Hays* v. *Pacific Mail Steamship Co., supra,* 17 How. (U.S.) 596, that California could not tax an ocean going vessel, owned and registered in New York and operating in interstate commerce between that port and various ports in California and Oregon. The decision announced the rule that such a vessel might be taxed at its full value in its home port, and that the other states where it engaged in commerce were not entitled to levy a property tax of any nature, even though the vessel made regular stops therein for the purpose of discharging or taking on passengers and cargo, and remained on each trip for repairs and maintenance, and to await announcement of the next voyage. The decision was predicated in part upon the lack of a taxable situs in any but the home port, and held that such vessels enter the ports of other states *"independently of any control over them, except as it respects such municipal and sanitary regulations of the local authorities as are not inconsistent with the constitution and laws of the general gov-*

*ernment, to which belongs the regulation of commerce with foreign nations and between the states."* (17 How. (U.S.) at p. 598; emphasis added.) The opinion failed to mention any specific constitutional provision or federal law with which the attempted tax was in conflict. The reference to the lack of taxable situs gives credence to the claim that the doctrine was placed, in part at least, upon the due process clause. However, the statement to the effect that regulation of foreign and interstate commerce belongs to the federal government, indicates that the court also predicated the doctrine, in part, upon the commerce clause, *even in the absence of any federal legislative enactment on the subject.* This theory is bolstered by the fact that the opinion also stated that a vessel plying the high seas in interstate commerce is subject to admiralty law, even when lying in a domestic port other than that of her registry, and as such differs from vessels which remain wholly within national waters. Thus, the rule appears to have been further predicated upon a concept that a vessel which sails upon international waters must be subjected to different rules than one which never leaves national waters. This appears to be the only logical explanation for holding that an instrument of interstate commerce is immune from state control or taxation in the absence of any showing that the Congress has entered the field.

Thus, the earliest statement of the "home-port" doctrine granted the state of domicile the power to tax in full, and denied to all other jurisdictions any power or right to tax except as might arise under the police power, when a vessel engaged in either interstate or foreign commerce used the open seas as a highway between ports.

Since that date, the rule of the Hays case has been extended and modified, to fit differing situations, but insofar as we have been able to determine, it has never been overruled. In fact, the court has specifically stated, as will be noted below, that certain of the limitations subsequently placed upon the rule were not to be deemed as altering the doctrine as applied to ships plying international waters.

California thereafter accepted and applied the doctrine as announced in the Hays decision (*City & County of San Francisco* v. *Talbot,* 63 Cal. 485, 488-489; *Olson* v. *City & County of San Francisco,* 148 Cal. 80, 82-83 [82 P. 850, 113 Am.St.Rep. 191, 7 Ann.Cas. 443, 2 L.R.A. N.S. 197]; *California etc. Co.* v. *City & County of San Francisco,* 150 Cal. 145 [88 P. 704];

*Sayles* v. *County of Los Angeles*, 59 Cal.App.2d 295 [138 P.2d 768], and other cases).

In 1870 the "home-port" doctrine was extended to vessels engaged in interstate commerce, and plying exclusively inland waters (*St. Louis* v. *Wiggins Ferry Co.*, 11 Wall. (U.S.) 423 [20 L.Ed. 192]), but such extension was overruled in 1948. (See *Ott* v. *Mississippi etc. Barge Line*, 336 U.S. 169 [69 S.Ct. 432, 93 L.Ed. 585].)

At a very early date the United States Supreme Court held that the doctrine, denying to jurisdictions other than that of domicile the power to impose property taxes, was *not* dependent upon actual taxation in the home port (*Morgan* v. *Parham*, 16 Wall. (U.S.) 471, 478 [21 L.Ed. 303]). By such decision, the United States Supreme Court inferentially held that the "home-port" doctrine was not based so much upon multiple taxation (which would clearly constitute a burden upon commerce in derogation of the commerce clause), as it was upon a concept of exclusive federal jurisdiction once an instrumentality of commerce left its home port for international waters. Viewed in light of the rule (established by the same court in *Cooley* v. *Board of Wardens of Port of Philadelphia*, 12 How. (U.S.) 299 [13 L.Ed. 996]) that the commerce clause does not prohibit the states from regulating commerce except in those fields wherein the federal congress has acted or those fields which admit only of one uniform system, it must be assumed that the authors of the "home-port" doctrine held that taxation of a vessel which arrived in port via international waters falls within one of the two stated exceptions. Since it was not contended that Congress had acted in regard to such matters, it follows that taxation (except in the home port) of vessels sailing upon the high seas was within the latter classification. As the court stated in the Cooley opinion: "Whatever subjects of this power [to regulate commerce] are in their nature national, or admit only of one uniform system, or plan of regulation, may justly be said to be of such a nature as to require exclusive legislation by Congress." (12 How. (U.S.) at p. 319.)

During the process of interpreting the "home-port" doctrine the courts carefully distinguished between the home port in its true sense (domicile of owner or permanent domicile of vessel) and fictitious home ports created solely by registry (*St. Louis* v. *Wiggins Ferry Co., supra*, 11 Wall. (U.S.) 423;

*Old Dominion Steamship Co.* v. *Virginia,* 198 U.S. 299 [25 S. Ct. 686, 49 L.Ed. 1059] ; *Ayer & Lord Tie Co.* v. *Kentucky,* 202 U.S. 409 [26 S.Ct. 679, 50 L.Ed. 1082] ; *Southern Pacific Co.* v. *Kentucky,* 222 U.S. 63, 67 [32 S.Ct. 13, 56 L.Ed. 96] ; *Olson* v. *City & County of San Francisco, supra,* 148 Cal. 80; *Sayles* v. *County of Los Angeles, supra,* 59 Cal.App.2d 295; *Ships etc. Corp.* v. *County of San Diego,* 93 Cal.App.2d 522 [209 P.2d 143] ). By such limitation, the courts prevented the possibility of a misuse of the doctrine by owners who would otherwise create a fictitious home port in order to escape taxation.

In 1890 the United States Supreme Court declared a distinction between vessels in interstate commerce and railroad rolling stock similarly engaged. In *Pullman's Car Co.* v. *Pennsylvania,* 141 U.S. 18 [11 S.Ct. 876, 35 L.Ed 613], it held that because rolling stock has no fixed situs, and travels over land, traversing and retraversing the various states, it must be treated differently for the purpose of taxation from ships which travel on international waterways, have a home port, and touch land only incidentally and temporarily. Quoting the earlier case of *Baltimore & Ohio R.R. Co.* v. *Maryland,* 21 Wall. (U.S.) 456 [22 L.Ed. 678], the court stated that interstate commerce on land is so dissimilar from interstate commerce by water that the two operations do not have the same aspects in reference to constitutional powers and duties of state and federal government, *and that since vehicles of commerce by water are instrumentalities of communication with other nations, the regulation of them is to be assumed by the national Legislature* (141 U.S. at pp. 23-24).[7]

The distinction thus announced between vessels sailing the high seas and railroad stock traveling by land ultimately led to the "apportionment doctrine" of taxation as applied to the latter. Such doctrine, thereafter applied by both federal and California courts, authorizes property taxation in each jurisdiction into which a vehicle of interstate commerce enters (*American Refrigerator Transit Co.* v. *Hall,* 174 U.S. 70 [19 S.Ct. 599, 43 L.Ed. 899] ; *Union Refrigerator Transit Co.* v. *Lynch,* 177 U.S. 149 [20 S.Ct. 631, 44 L.Ed. 708] ; *Union Transit Co.* v. *Kentucky,* 199 U.S. 194 [26 S.Ct. 36, 50 L.Ed. 150] ). Such cases, however, did not alter the original "home-port" doctrine as applied to vessels, whether sailing the high

---

[7]Again inferentially holding that the "home-port" doctrine is not predicated upon any present pre-emption of the field by the national Legislature.

seas or exclusively inland waters. The doctrine remained applicable to all vessels which left the jurisdiction of a single state until 1948, when the United States Supreme Court had occasion to reexamine the rule. In the case of *Ott* v. *Mississippi etc. Barge Line, supra,* 336 U.S. 169, the court inferentially overruled the St. Louis decision, and held that there was no distinction, insofar as the due process and commerce clauses are concerned, between railroad cars and vessels when each move between the states by exclusively inland routes. In upholding an apportioned tax by Louisiana on tugs and barges operating out of another state on the Mississippi River, it distinguished the former cases (which adhered to the "home-port" doctrine) on the ground that they involved ships sailing the high seas. As to those cases which had applied the "home-port" doctrine of taxation to vessels plying only inland waters (presumably the St. Louis case) the court stated that for one reason or another the apportionment method of taxation had not been considered. Thus, the St. Louis case was overruled by implication. The decision would have been more precise had the court expressly overruled the St. Louis decision on the ground, only implied in the decision, that further analysis indicated that the very basis of the "home-port" doctrine (i.e., exclusive federal concern in regard to instrumentalities of communication with other nations) does not exist when the instrumentality does not leave the national boundaries. Of utmost importance, however, is the language of the Ott opinion (pp. 173-174) wherein the court said, "We do not reach the question of taxability of ocean carriage but confine our decision to transportation on inland waters." Thus, the limitation placed upon the "home-port" doctrine by the Ott decision does not rest upon whether the commerce is interstate or foreign, but upon whether the instrumentality stayed within the continental limits of the United States or travelled in international waters. Probably the court in making this distinction had in mind the reasoning, originally expressed in the Hays case, that when a vessel sails the international seas it becomes subjected to the rules of admiralty law, even while at rest in a domestic port. In other words, the court held (without specifically stating) that an instrumentality of commerce which leaves the nation's shores becomes so peculiarly imbued with international characteristics that it would be unwise to allow any state but that of domicile to exercise

sovereignty beyond that necessary under ordinary police powers.[8]

When the apportioned method of taxation was originally adopted (first as applicable to railroad rolling stock, and subsequently to ships operating exclusively on inland waters) the taxation was held to be valid if levied under any formula which was reasonably related to the use of the property in the taxing state, or to the benefits or protection conferred on the property by that state. But in *Southern Pacific Co.* v. *Kentucky, supra,* 222 U.S. 63, the court appeared to repudiate the doctrine of measuring the legality of the tax by the benefits or protection received. Because the case involved ocean-going vessels, subject to the ''home-port'' doctrine, it cannot be said to be determinative of any rule or formula for taxing those instrumentalities which are subject to apportioned levies. Although we have found no case which requires the use of any specific formula, it appears that any method which a state uses to determine an otherwise legal apportioned tax must bear such relationship to time or use within the taxing state that the sum total of all apportioned taxes so levied by all states will not exceed one full ad valorem assessment. This conclusion is further strengthened by the ultimate announcement by the Supreme Court (predicated on due process) that: ''The rule which permits taxation by two or more states on an apportioned basis precludes taxation of all of the property by the state of domicile.'' (*Standard Oil Co.* v. *Peck* (1952), 342 U.S. 382, 384 [72 S.Ct. 309, 96 L.Ed. 427, 26 A.L.R.2d 1371].)

It was inevitable that the issue of full taxation at the home port versus apportioned taxation at each port of call would arise in regard to air transportation. Certain phases of that issue have been presented to both the United States Supreme Court and to the various appellate courts of this state; but insofar as we have been able to determine, the precise question involved herein has not been heretofore before any court.

The first United States Supreme Court case to consider the subject was *Northwest Airlines* v. *Minnesota* (1944), *supra,* 322 U.S. 292. That case involved a fleet of airplanes owned

---

[8]Although it might have been more logical to have stated a distinction between interstate and foreign commerce it serves no real purpose to speculate on what the court might do if presented with the same problem today. Since we are here dealing with instrumentalities of foreign commerce, travelling international skies, the distinction, if any, between the two bases for the doctrine is moot herein.

and operated by a Minnesota corporation, registered with a city of that state as their home port, utilizing that city as their rest and overhaul base, and operating therefrom entirely in interstate commerce. The court held that a Minnesota property tax levied upon the entire fleet on a full ad valorem basis did not violate either the commerce clause or the due process clause. Even though the planes were known to be engaged in commerce in several other states (which might presumably tax them on an apportioned basis) the majority opinion held that taxability by such other states was not before the court. Thus, although the Northwest case authorized the full ad valorem tax in the state of domicile, it cannot be said to have applied the "home-port" doctrine to interstate aircraft. Neither can it be taken for authority that apportioned taxes may be levied on such instrumentalities in each state. The apparent inconsistency of the language (inferring that both full ad valorem tax and apportioned tax might be possible under some circumstances) may be explained by the fact that the case preceded, by eight years, the Standard Oil case which put an end to such possibility. At least, such was the basis on which the court later explained the decision. (See Braniff Airways case, 347 U.S. 590, *infra*.) A more substantive question arises from the fact that the Northwest decision did not give consideration to those cases wherein it had previously held that instrumentalities of interstate commerce which do not leave the continental limits of the United States will be taxed on an apportioned basis in each state visited (*Ott* v. *Mississippi etc. Barge Line, supra*).[9] Analyzed in light of subsequent decisions, the Northwest case stands only for the proposition that domestic airplanes, flying exclusively in interstate commerce, and not leaving the continental limits of the United States, may be taxed at their home port on a full ad valorem basis if the parties do not urge the possibility of taxation elsewhere. It cannot be held to be a final determination

---

[9]The authorization of a full ad valorem tax in the jurisdiction of domicile follows the original "home-port" doctrine as the same stood before it was modified to exclude vehicles of interstate commerce which do not leave inland routes. The various inconsistencies inherent in the decision are not surprising when it is noted that the court was unable to muster a majority to a single opinion, and that the decision consisted of a majority opinion by three justices, concurred in by two separate opinions of single justices, together with a dissenting opinion of four (making four separate and distinct opinions). Only the dissenting opinion discussed the relation between taxation of ocean-going vessels and other interstate vehicles as applied to airplanes.

of whether the full ad valorem tax or an apportioned tax is proper when all the facts are known; and it is in no manner a determination of the basis for taxation of airplanes engaged in either interstate or foreign commerce and which fly outside the limits of the country. It is certainly not authority of any kind regarding foreign owned and based airplanes flying exclusively in foreign commerce.

Taxation of airplanes was next presented ten years later in *Braniff Airways* v. *Nebraska State Board of Equalization* (1954), *supra*, 347 U.S. 590. In that decision the court authorized an apportioned tax by Nebraska on plaintiff's airplanes which were domiciled elsewhere, but which were engaged in interstate commerce in Nebraska. The case did not involve foreign commerce, and the planes did not leave continental United States. The court predicated the decision on taxable situs in Nebraska (due process) and held that since there was no demonstrable burden on interstate commerce, the commerce clause was no bar. In order to set at rest the inconsistencies of the Northwest decision, the court said, at p. 602: "When *Standard Oil Co.* v. *Peck* . . . was here, the Court interpreted the Northwest Airlines case to permit states other than those of the corporate domicile to tax boats in interstate commerce on the apportionment basis in accordance with their use in the taxing state. We adhere to that interpretation."[10] The Northwest and Braniff cases (taken together with the intervening Standard Oil decision) therefore stand only for the proposition that airplanes, flying solely in interstate commerce, and not crossing international boundaries, are to be treated (for the purpose of taxation) in the same manner as vessels engaged in similar commerce via exclusively inland waters. The language and rationale of the decisions create the inference that, should the United States Supreme Court be presented with a situation involving airplanes engaged in foreign commerce, or planes engaged in interstate commerce via international routes,[11] it would apply the same doctrines it has consistently applied to ocean-going vessels similarly engaged.

[10]Perhaps it would have been clearer had the court frankly admitted that the apportioned doctrine of taxation was not urged by the parties in the Northwest case, and hence the court had failed to consider its impact upon their decision therein.

[11]As between Alaska and other states of the union, with stops in Canada; or as between Hawaii and the mainland.

Two years subsequent to the Braniff decision the question of taxation of airplanes was presented in California, in *Slick Airways* v. *County of Los Angeles, supra,* 140 Cal.App.2d 311.[12] In that case the parties conceded that Los Angeles County was entitled to tax, on an apportioned basis, a fleet of airplanes owned by a Delaware corporation and operated in interstate commerce between airports in various states, including Los Angeles. The only issue was whether Los Angeles was entitled to tax on a full ad valorem basis a single airplane which plaintiff purchased in that county and which it kept therein for the purpose of conducting ''shakedown'' flights prior to adding it to the fleet. The court held that such facts did not give the airplane such permanent situs in Los Angeles as would preclude taxation on an apportioned basis elsewhere, and that the defendant county was therefore without the power to levy more than an apportioned tax. From the point of view of its place in this review of the growth of the doctrines governing taxation of instruments of commerce, the case is important only in that it is the first California decision in which there was an opportunity to determine the status of airplanes. The opinion followed the lead of the United States Supreme Court by subjecting the airplane in question to the same doctrines which were applicable to ships similarly engaged. The decision does not purport to deal with taxation of airplanes engaged in flights outside of continental United States.

In 1958 this court decided *Flying Tiger Line, Inc.* v. *County of Los Angeles, supra,* 51 Cal.2d 314. Plaintiff, a Delaware corporation with its principal place of business in Los Angeles, operated airplanes in interstate commerce, as to which there was no issue.[13] It also owned five airplanes which it operated under the control of the United States military authorities on the Pacific airlift, in support of the war in Korea. In a four to three decision arrived at by a majority opinion of three, one other justice concurring in the result, the court held that a full ad valorem tax on such planes was improper, and plaintiff was granted the only relief which it sought, i.e., refund of the difference between the tax paid on the full ad valorem basis and a tax calculated on an apportioned basis. The dissenting opinion expressed the view that since it was

---

[12]Hearing by the Supreme Court was not requested.

[13]The interstate planes were taxed on an apportioned basis, and were not involved in the action before the court.

not shown that the property was subject to taxation elsewhere, it should be subjected to a full ad valorem tax in California.[14] None of the three opinions discussed the impact of the "home-port" doctrine as it might be applicable to airplanes flying international skies. The authorities relied upon by the majority (Northwest Airlines, *Ott* v. *Mississippi etc. Barge Line, Standard Oil Co.* v. *Peck*, Braniff Airways, and Slick Airways, all *supra*) were all cases involving instrumentalities of interstate commerce which did not leave the continental limits of United States. By placing reliance on these decisions, the majority seemed to have been of the view that the Flying Tiger airplanes were to be treated as if they were engaged in interstate commerce. The case cannot be considered authority for the proposition that airplanes flying only in foreign commerce will be taxed on either the "home-port" or the apportioned basis.

From the foregoing summary of United States and California decisions dealing with the "home-port" versus apportioned doctrines of taxation of instrumentalities of commerce, certain conclusions may be drawn. These are the "settled principles" which determine the validity or invalidity of the instant tax, and may be stated as follows:

1. Although movable personalty is generally held to be taxable only at its owner's place of residence, it may attain a tax situs different from such place by reason of permanency of location or use within the taxing jurisdiction;

2. The basis for such alternative tax situs must be a reasonable one, and cannot be supplied by arbitrary acts of the owner, taken for purposes of tax avoidance;

3. Ocean-going vessels, plying international waters, engaged in either interstate or foreign trade, even when owned by residents or citizens of this country, may not be taxed by any jurisdiction other than that of their home port, as such is defined above; and the jurisdiction of domicile may tax such instrumentalities on a full ad valorem basis;

4. The denial of taxing power to the nondomiciliary states does not depend upon the actual fact of taxation at the domicile, but is based upon the proposition that instrumentalities of communication with other nations comprise a

---

[14]The dissent acknowledged that multiple taxation would be unconstitutional, as a burden in violation of the commerce clause, but predicated its argument on the lack of evidence that the planes might be taxed elsewhere; thus avoiding conflict with the established rule that power to tax elsewhere, rather than actual taxation, is controlling.

field which admits of but one uniform system of regulation, which by its very nature must be exclusively federal;

 5. Because of the exclusively federal nature of the field, it makes no difference that the Congress has not acted in the field of taxation of such instrumentalities;

 6. Because the proposition stated as (4), above, does not apply to them, instrumentalities of interstate commerce which do not leave United States (such as railroad rolling stock and vessels plying inland waters, only) may be taxed in each jurisdiction wherein they are engaged in commerce;

 7. In order to avoid a burden on commerce, the various jurisdictions authorized to tax under the last stated principle must confine themselves to a levy on an apportioned basis, related to the time or use within the jurisdiction, rather than to the benefits conferred, in order that the total taxes so assessed shall not amount to more than one single ad valorem tax;[15]

 8. It follows that the right of one such jurisdiction to tax on an apportioned basis precludes the right of the jurisdiction of domicile to tax on a full ad valorem basis;[16]

 9. Since such practice would do violence to the principles stated above, the furnishing of benefit and protection, standing alone, does not confer on any jurisdiction the power to tax an instrumentality of commerce unless the instrumentality falls within the class of property which may be taxed according to the stated principles;

 10. Airplanes flying solely in interstate commerce, and based in the United States, or owned by domestic concerns, and which do not leave the jurisdictional limits of the United States, will be taxed under the same principles which apply to other instrumentalities of interstate commerce.

Neither state nor federal courts have as yet been called upon to determine the application of these principles to domestically owned and based airplanes flying in foreign commerce, other than in the Flying Tiger case, which, for the reasons already discussed, is not here controlling. Nor has there been any occasion (prior to the instant case) to determine the applicability of such principles to foreign owned

---

[15]Obviously, this rule can only be enforced within the United States, where the Supreme Court may act as arbiter between the several jurisdictions.

[16]See footnote 15, *supra.*

and based airplanes operating solely in foreign commerce and touching only one port in the United States.

It could be held that the instant case is controlled by the "home-port" doctrine which has been uniformly applied by both state and federal courts for over a hundred years; that under that doctrine no jurisdiction, other than that of the true domicile, may tax instrumentalities of communication engaged in foreign commerce; and that airplanes, flying the international skies, do not differ substantially from vessels sailing the international seas. If these conclusions are sound, then, under the doctrine of *stare decisis,* the judgment of the trial court should be affirmed.

But, because the precise question here involved has not yet been passed upon by the federal courts, we think we should also decide the question on principle. The question is, should the "home-port" doctrine, as a matter of principle, be applied to the facts of the instant case?

We think that that doctrine should be so applied. The prior cases, while they have not decided the precise point here involved, have laid down a very definite pattern of constitutional law which we think is sound and controlling.

It certainly has been established that any instrumentality of commerce is subject to taxation in its true domicile. But this power to tax is subject to limitations as to the manner of taxation when a taxable situs has been acquired in another jurisdiction. The need for such limitation arises from the necessity of protecting against double taxation. Thus the instrumentality which, by reason of being engaged in interstate commerce, gains taxable situs in two or more states, is subjected to taxation on an apportioned basis only; and that fact limits the right of the domicile to impose a full ad valorem tax. But, by reason of other considerations, not every instrumentality of commerce may gain more than a single taxable situs. When such a vehicle becomes an instrument of communication with foreign nations it is apparent that the apportioned basis of taxation is unworkable because the courts of this country can exercise no control over the foreign taxing authorities. The matter then should become an exclusively federal one. To this extent we agree partially with the appellants herein who state in their briefs on file that: "State taxation of the planes of foreign air carriers involves international political and economic problems which the courts are incapable of satisfactorily resolving. Decision

of whether the states should have the power to tax planes of foreign air carriers engaged in foreign commerce should be left exclusively with the executive and legislative branches of the federal government.'' Of course, appellants' quoted statement was made in support of the argument that we are unable to act in contravention of the tax. We cannot agree with that conclusion. We do, however, find in their statement solid ground on which to hold that the exclusively federal nature of the field requires us to apply the ''home-port'' doctrine, and thus to hold that no jurisdiction save that of domicile has any authority to levy a personal property tax on these airplanes. There is no logical basis for holding that these airplanes differ from other instrumentalities of communication with foreign nations, so as to avoid that doctrine. As the vessel which sails the seas is subject to admiralty law, airplanes flying international skies are subject to all manner of international aviation law. They are in no manner the equivalent of instrumentalities of commerce which travel exclusively between the various states of this country.[17]

 In our opinion, the basic reasoning behind the controlling principles is that any instrumentality which engages in commerce between two or more sovereign nations must have but one taxable situs. Common sense requires that such situs be the port where the instrumentality is in good faith domiciled.

It is true that this conclusion does not explain the inclusion in the ''home-port'' doctrine of vessels plying international waters but engaged solely in interstate commerce. Such vessels were originally included in the doctrine on the ground that they never gained taxable situs in the port which they temporarily visited. The view expressed in this opinion would exclude them from the doctrine because, not being instruments of communication with a foreign country, they do not

---

[17]Such instrumentalities, be they ferry boats, tugs, motor vehicles or railroad rolling stock, remain for unlimited periods of time within the taxing state, utilizing the wharves, port facilities, rails, roads, streets and other facilities of the state, moving from point to point therein, loading and unloading at various points, and perhaps engaging in intrastate activities therein. They have therefore been considered to have gained a taxable situs in such state far beyond that which might be applicable to that of a ship or airplane which enters the state only at a port of entry to the United States, and which remains in such port until it again leaves the country. There appears to be no reason why the former should not be taxed in proportion to its semi-permanent sojourn in the state and its use of divergent facilities unconnected with those of the port of entry.

pose an exclusively federal question. This distinction, perhaps, can be explained on historical grounds. The fact that the courts have not announced a change in the "home-port" doctrine to the extent of excluding such vessels may be attributed to the fact that no case involving such an instrumentality of commerce has been brought before them in recent times. As a matter of principle it should be held that both seagoing vessels and airplanes engaged solely in interstate commerce are subject to the apportionment theory of taxation, regardless of utilization of inland or international routes. But even if it were so held, such holding would not affect the status of instrumentalities engaged in commerce with foreign nations. Whether they be sailing vessels, steamships or airplanes, they are in a different category. In our opinion, being instrumentalities of communication with foreign nations, they remain subject to the "home-port" doctrine and are not taxable anywhere but in the jurisdiction of their domicile. They enter the territory of a given state for the sole purpose of utilizing a port thereof as a port of entry to the United States. In this respect there is no distinction between a ship or an airplane when both engage in commerce between nations. Both are amenable to international law and agreement. Each may be fully taxed in its home port in such manner as the laws of the domicile provide, and those laws are not subject to review by the courts of the nation in which the nondomiciliary port is located. Otherwise double taxation would inevitably result. In the language of the Hays case, each must be considered to enter the nondomiciliary port "independently of any control over them, except as it respects such municipal and sanitary regulations of the local authorities as are not inconsistent with the constitution and laws of the general government to which belongs the regulation of commerce . . . ."

A somewhat analogous situation has been discussed in those cases involving the second and third clauses of section 10 of article I of the United States Constitution.[18] In reviewing attempts by various ports of entry to levy charges against ships entering their harbors, the federal courts have held such

---

[18]The pertinent language provides:

"[cl. 2] No State shall, without the Consent of the Congress, lay any Imposts or Duties on Imports or Exports, except what may be absolutely necessary for executing its inspection laws . . . .

"[cl. 3] No State shall, without the Consent of Congress, lay any Duty of Tonnage . . . ."

charges to be valid when either the ship or its owner was domiciled within the taxing authority (*The North Cape* (N.D. Ill.), 18 F.Cas. 342), or when the charge was imposed for the use of wharves or other facilities, as distinct from a general tax (*Vicksburg* v. *Tobin,* 100 U.S. 430, 433 [25 L.Ed. 690]; *Clyde Mallory Lines* v. *Alabama,* 296 U.S. 261 [56 S.Ct. 194, 80 L.Ed. 215]). But the federal courts have held such charges to be invalid when they constituted an attempt to levy a property tax on instrumentalities of commerce not domiciled therein. (See *Gibbons* v. *Ogden,* 9 Wheat. (U.S.) 1, 89 [6 L.Ed. 23]; *Packet etc. Co.* v. *Keokuk,* 95 U.S. 80 [24 L.Ed. 377]; *Peete* v. *Morgan,* 19 Wall. (U.S.) 581 [22 L.Ed. 201]; *State Tonnage Tax Cases,* 12 Wall. (U.S.) 204 [20 L.Ed. 370].) The rationale of those cases appears to be that: a duty of tonnage imposed upon an instrumentality of commerce (i.e., the carrier as distinct from the cargo) which is not owned or domiciled within the state, and which duty is not a charge for a specific service rendered, amounts to a duty levied as a condition to being allowed to enter or leave port; such a duty represents an interference with commerce; and, no state is at liberty to interfere with foreign commerce. The fact that the present case involves an ad valorem tax rather than a tax based upon tonnage of vessel does not alter the underlying principles. While valuation may be used as a basis for taxing an instrumentality of commerce when the owner is a resident, or when the instrumentality has otherwise acquired a taxable situs, the power to so tax is based upon the right to tax the person upon his financial investment (*Wheeling etc. Transportation Co.* v. *Wheeling,* 99 U.S. 273, 279 [25 L.Ed. 412]). If the charge attempted to be imposed is one which, by the terms of the statute or ordinance imposing it, may become due from an instrumentality of foreign commerce without any services being rendered to it, or without the enjoyment of special benefits, and from the mere fact that it has arrived in a port of the state, it is a charge on tonnage, and therefore not collectible (48 Am.Jur., § 651, p. 454, citing various federal cases as well as this court's opinion in *Oakland* v. *E. K. Wood Lumber Co.,* 211 Cal. 16 [292 P. 1076, 80 A.L.R. 379]). There is no logical reason why the stated principles should apply only if the proposed tax is based upon the gross tonnage of a vessel, and be inapplicable if the same tax is based upon the vessel's value. Those principles are equally applicable as a basis for applying the "home-port" doctrine

to airplanes flying exclusively in foreign commerce and utilizing a port of this state as a port of entry to the United States.

In attacking the "home-port" doctrine as here applied, defendants urge several arguments. They contend that the real basis for distinguishing between vessels sailing the high seas and those plying only inland waters is not a commerce concept at all and that it springs solely from the common law concepts of admiralty which are not necessarily applicable to airplanes. Such an argument overlooks the fact that the vessels between which such distinction was made were all engaged in interstate commerce, and that here we are dealing with instrumentalities of foreign commerce. ▮ Another answer to the argument is that since the advent of the airplane there has developed an equally large body of international air law, which, when substituted for the admiralty concepts, provides equal reason for considering international air flights on the same basis as vessels sailing international waters.

Defendants also urge the apparent trend of the United States Supreme Court in declaring more and more exceptions to the application of the rule as first announced in the Hays decision. This, they argue, indicates a definite attitude in opposition to the "home-port" doctrine. They claim that if the higher court were given the opportunity today, it would repudiate the entire rule as contrary to modern theories of taxation. One answer to this proposition comes from the United States Supreme Court itself. As mentioned above, in our analysis of the growth of the doctrine, in 1948 that court excluded vessels utilizing only inland waters from the application of the "home-port" rule (*Ott* v. *Mississippi etc. Barge Line, supra,* 336 U.S. 169). In so doing, it expressly refrained from making the decision applicable to interstate vessels traversing the open seas. Why, then, should we anticipate a change in regard to instrumentalities of foreign commerce, as to which there is greater cause to apply the doctrine? If, as is argued, that court is about to reverse itself, it is not for us to anticipate such action. At this point we would not consider a request to hold that a steamship plying the high seas in foreign commerce is to be excluded from application of the "home-port" doctrine. We should not be expected to do so in regard to an airplane similarly engaged, when the controlling principles (and reasoning behind them) are equally applicable. ▮ We therefore hold the "home-port" doctrine to be applicable herein, and that the power to tax air-

planes engaged solely in commerce with foreign nations is vested exclusively in the place of true domicile, which jurisdiction may impose a tax on the full value, to the exclusion of property taxation elsewhere, whether upon an apportioned basis or otherwise.

*Is the tax barred by federal regulation or international treaty?*

This conclusion is sufficient to dispose of the case. But because we have elected to decide this case on principle as well as on the doctrine of *stare decisis* there are other factors that should be considered. One is the impact, if any, of federal regulation and treaty on defendants' power to impose the instant tax. Admittedly, under the commerce clause of the United States Constitution, the Congress is given the power to legislate as to interstate and foreign commerce to the exclusion of the several states. If it has done so the tax here involved must be held to be invalid. ■ Plaintiff does not cite us to any federal legislation which, by its nature, specifically excludes state taxation. The regulatory enactments which it pleads indicate that Congress has pre-empted the field of regulating air traffic (both foreign and interstate) to the extent of protecting public safety, welfare, convenience and necessity. But none of the regulatory enactments indicate an intent to enter, or to bar the states from entering, the field of taxation. Insofar as they should be considered herein, the federal regulations which have been called to our attention do not bar the tax imposed by defendants. They do, however, indicate the peculiarly federal nature of the entire field.

■ The international treaties upon which plaintiff relies pose a more difficult problem. They represent executive action, and although approved by the Senate (U.S. Const., art. II, § 2, cl. 2) are not the Congressional action contemplated by the commerce clause (art. I, § 8, cl. 3). But they are equally binding on the states. ■ Treaties are the supreme law of the land, binding upon the courts of every state (art. VI, cl. 2). If the tax here under review is repugnant to the terms of any such treaty, the tax must be declared invalid.

■ Of the several treaties alleged in the complaint as regulating plaintiff's operations, three are of particular interest. These are: (1) "Convention and protocol between the United States of America and Sweden respecting double taxation," dated March 23, 1939, ratified August 2, 1939,

proclaimed December 12, 1939, and effective January 1, 1940 (54 Stat. 1759, T.S. No. 958); (2) ''Convention between the United States of America and Denmark respecting double taxation . . .'' dated May 6, 1948, and effective December 1, 1948 (62 Stat. 1730, T.I.A.S. No. 1854); and (3) ''Convention between the United States of America and Norway for the avoidance of double taxation . . .'' dated June 13, 1949 (2 U.S.T. [1951] pt. 2, p. 2323, T.I.A.S. No. 2357, and 2 U.S.T. [1951] pt. 2, p 2353, T.I.A.S. No. 2358). These treaties, by their language, are aimed at the avoidance of duplication of taxation by the signatory powers, or by political subdivisions thereof, in cases where nationals of one signatory power are engaged in business in the territorial limits of the other power. It is also clear that they are intended to cover shipping and air traffic within the protected types of business ventures. The extent to which they go, particularly with reference to the types of taxation against which protection is afforded, is not clear. If reference is made to the titles, only the treaties with Denmark and Norway would appear to be limited to taxes on income, estates and inheritances. Nothing in the title of the treaty with Sweden limits the type of taxes which is intended to be covered. The preamble of the latter states that the parties are ''desirous of avoiding double taxation and of establishing rules of reciprocal administrative assistance in the case of income *and other* taxes. . . .'' (Emphasis added.) Article I of that treaty sets forth a list of taxes (by general type rather than specific name) as the ''taxes referred to in this Convention.'' In the case of the United States the list includes federal income tax (including surtax and excess profits tax) and federal capital stock tax. In the case of Sweden income and property taxes are mentioned. As to both powers, the list includes ''any other or additional taxes imposed by either . . . upon substantially the same bases as the taxes enumerated herein.'' If we were to read no further it might be assumed that the treaty does not apply to property taxes imposed by the several states of this nation. However, article XIII, without referring to the statements made in the preamble or in article I, provides that in regard to certain types of property (*specifically including air transport undertakings*) ''taxes on property or increment of property . . . may be levied only in that contracting State which is entitled under the preceding Articles to tax the income from such property.'' Referring to such preceding articles, it is clear

that neither nation may tax the profits of enterprises of the citizens of the other except as such profits are allocable to a permanent establishment in the taxing nation (art. II). Even more specific is the provision that income of an enterprise derived from the operation of a ship or aircraft shall be taxable only in the nation in which such ship or aircraft is registered (art. IV). Taking the treaty as a whole, we find that the United States and Sweden have agreed that each will refrain from taxing either the income of or the property belonging to the nationals of the other country except insofar as such income is allocable to or the property is a portion of a permanent establishment in the taxing nation. Insofar as ships and air lines are concerned they have agreed to levy neither income nor property tax even where there is a permanent establishment, if such vehicle of commerce is not registered in the taxing nation. Since plaintiff maintains no permanent establishment in the United States, and one-third of its airplanes are registered and based in Norway, Sweden and Denmark, respectively, it follows that the instant tax, at least insofar as it is applied to the one-third of the planes registered in that country, is barred by the provisions of the treaty with Sweden.

Turning now to the treaties with Norway and Denmark, we find no such specific ban upon property taxes as appears in the Swedish treaty. However, clause XVI of the Danish treaty provides that citizens of either of the contracting nations (including persons, partnerships, corporations, associations, etc.) while resident in the other contracting nation shall not "be subjected therein to other or more burdensome taxes than are the citizens of such other contracting State residing in its territory. As used in this paragraph . . . 'taxes' means taxes of every kind or description whether national, Federal, state, provincial or municipal." This clause obviously expresses an intent to prevent a state, such as California, or a city or a county, such as the defendants herein, from levying a discriminatory tax against Danish nationals. It can be argued that the apportioned property tax which defendants seek to impose upon these airplanes is the same tax which they impose upon all citizens (i.e., domestic air lines) of California or the United States. The fact remains, however, that such tax is a "more burdensome" tax than imposed upon domestic lines because the latter do not also pay ad valorem property taxes in Denmark.

Those Norwegian treaties mentioned above do not make specific reference to personal property taxes, but they do contain language which may be relied on for an argument that the federal government intended to relieve the Norwegian air lines from taxes such as are at issue here. The treaty dealing with income taxes provides that income which enterprises of either nation shall derive from the operation of ships or aircraft shall be exempt from taxation in the other contracting nation. The treaty concerning taxes on estates and inheritances, in providing for the taxable situs of movable property in general, makes a specific exception of ships, aircraft and shares thereof by providing that their taxable situs shall be the place of registration or documentation.

In addition to the formal treaties alluded to above, there are also in existence a series of executive agreements with each of the three countries referred to as "Air Navigation Agreements," "Air Transportation Agreements," "Air Worthiness Agreements," "Pilot License Agreements," etc. The various "Air Transportation Agreements" (Denmark—58 Stat. 1458, E.A.S. No. 430, amended 60 Stat. 1646, T.I.A.S. No. 1519; Norway—59 Stat. 1658, E.A.S. No. 482; Sweden—58 Stat. 1466, E.A.S. No. 431, amended 60 Stat. 1859, T.I.A.S. No. 1550) contain articles designed to "prevent discriminatory practices, and to assure equality of treatment," specifically prohibiting unequal charges for airport facilities, exemption from custom duties, etc., but none mentions taxation as such. On the one hand this fact tends to sustain an argument that the contracting parties did not intend to include taxation within the possible discriminatory practices which they sought to eliminate. On the other hand, it may be argued with equal force that since there had never been a tax of this type imposed on the dates of the respective treaties and agreements, the parties did not have the question of local taxes in mind, and would have included them as a prohibited method of discrimination had they existed. Certainly, it is within reason to infer that the foreign negotiators, unfamiliar with our dual federal-state system, may have assumed that once they had eliminated all possibility that the federal government would levy a double or multiple tax, there was nothing left to fear except the possibility of unfair discriminatory practices by airports and other nongovernmental agencies.

In our opinion, the language of the various treaties and agreements clearly eliminates the possibility of local property

taxation only insofar as concerns those airplanes owned and registered in Sweden. As to that portion of the tax, the judgment of the trial court must be affirmed on this point alone. As to the remaining two-thirds of the airplanes, there remains considerable doubt as to the effect of the federal commitments, with only a possibility that the contracting states intended to prevent any taxation of any nature (local or otherwise) which would afford the domestic air lines of one country any advantage over those of the other country where such domestic and foreign lines may be in competition. The instant tax would discriminate in favor of any United States line competing with these Scandinavian lines in commerce between the respective nations. But the mere possibility that the signatory powers may have so intended is not sufficient ground on which to invalidate that portion of the tax imposed upon the planes registered in Norway and Denmark. Because we cannot spell out such an intent in the treaties with those nations, we cannot invalidate the tax upon the ground that it is repugnant to the terms of *those* treaties. However, we have already determined that the tax is repugnant to the treaty with Sweden, and must be deemed invalid as to the airplanes based and registered in that country. Does this mean that defendants are prohibited from taxing Swedish airplanes, and yet free to tax planes operating in a similar manner, but owned and based in other foreign countries? We think not. Such a situation would immediately create discrimination between foreign commerce based in a treaty country and similar commerce based in other nations. Such discrimination would constitute interference with the free flow of commerce. As said in *Northwestern etc. Cement Co.* v. *Minnesota,* 358 U.S. 450, 458 [79 S.Ct. 357, 3 L.Ed.2d 421, 67 A.L.R.2d 1292], and in *Freeman* v. *Hewit,* 329 U.S. 249, 256 [67 S.Ct. 274, 91 L.Ed. 265], the commerce clause denies to the states "one single-tax-worth of direct interference with the free flow of commerce." It is obvious that no individual state has power to discriminate between foreign nations. The principles of state sovereignty apply to internal matters, only. No state of this union is sovereign in the eyes of a foreign nation. A state cannot deal directly with a foreign nation, by treaty or otherwise. This it must leave to the federal government. If its attempted actions in a given field would result in discriminatory practices as between two

foreign nations, then it must eschew that field in its entirety. This is but another way of saying, as we said above, that taxation of foreign owned and based instruments of commerce represents a field that is peculiarly federal in nature, without regard to such specific constitutional considerations as the commerce clause or the due process clause, and which must be left to the administration of the federal government, even in the absence of any present federal legislation thereon.

For the reasons set forth, we are of the opinion that the terms of the treaty with Sweden prevent the several states from imposing any type of property tax upon airplanes owned, based and registered in *any* foreign country, unless the overall operations of the owner bring such airplanes within the area of property to be taxed, as such is defined in that treaty.

*Additional issues urged by the parties*:

The foregoing considerations are determinative of the matter. We expressly refrain from any decision upon plaintiff's contention that neither the California Constitution nor any statutory provision provides a basis for the instant tax. The balance of the arguments have been answered above, or have become moot by reason of the grounds upon which we base our decision.

It is significant that we have been cited to no instance wherein any state or political subdivision has ever attempted to levy a property tax upon an instrumentality of foreign commerce which was both owned and based in a foreign country. And this is true even though each of our major seaports is visited regularly by passenger liners and freighters, operating on regular schedules, in the same manner in which plaintiff's airplanes visit Los Angeles International Airport. All of the cases cited above dealt with vessels, airplanes, and other instrumentalities owned or based in this country. The entire lack of any case dealing with any instrumentality owned or based elsewhere indicates that no state has ever attempted to tax foreign instrumentalities of commerce arriving within its jurisdiction solely in foreign trade. If, during the 185 years of existence of the United States such property has been assumed to be nontaxable, it makes little difference whether this belief stemmed from constitutional prohibitions or from considerations of policy. If such assumption were now to be overruled, we would open the doors to state taxa-

tion of every ocean vessel which, for 185 years, has been believed to be nontaxable. The repercussions would be worldwide. Retaliatory taxation would be inevitable. The states could not cope with such a situation. The only escape from such a result would be by holding that airplanes might be taxed under circumstances wherein a ship may not. No logical basis for such a distinction has been advanced.

The judgment is affirmed.

Schauer, J., McComb, J., and White, J., concurred.

DOOLING, J.—I concur in the judgment and with the conclusion that the existing decisions of the Supreme Court of the United States on the "home-port" doctrine as it relates to the right to tax vessels engaged in foreign commerce are binding upon this court. This phase of the "home-port" doctrine has never been modified or overruled and, if the doctrine is to be reexamined, the nation's highest judicial tribunal which announced it is the only court which can effectively make such reexamination. Unless that court sees fit to do so, and this case might afford a handy vehicle if its Justices are so minded, I feel bound to follow the existing law in this field as declared by its earlier decisions.

TRAYNOR, J.—I dissent.

Neither the due process clause nor the commerce clause nor the tonnage clause of the United States Constitution precludes state taxation on an apportioned basis of aircraft flown in interstate commerce. (*Braniff Airways* v. *Nebraska State Board of Equalization,* 347 U.S. 590, 600 [74 S.Ct. 957, 98 L.Ed. 967]; see also *Flying Tiger Line, Inc.* v. *County of Los Angeles,* 51 Cal.2d 314, 318 [333 P.2d 323].) They do not preclude equivalent taxation of aircraft owned by foreign domiciliaries flown in foreign commerce.

"So far as due process is concerned the only question is whether the tax in practical operation has relation to opportunities, benefits, or protection conferred or afforded by the taxing State. [Citation.] Those requirements are satisfied if the tax is fairly apportioned to the commerce carried on within the State." (*Ott* v. *Mississippi etc. Barge Line, supra,* 336 U.S. 169, 174; *Braniff Airways* v. *Nebraska State Board of Equalization, supra,* 347 U.S. 590, 600.) Since plaintiff's relationship to California is no different from that of airlines

engaged solely in interstate commerce, and since the "oppor-
tunities, benefits, or protection conferred or afforded" are not
affected by the locations of plaintiff's out-of-state termini, the
due process clause does not preclude the taxation of its aircraft.

Nor does the commerce clause or the tonnage clause[1] exempt
the instrumentalities of foreign commerce from state ad va-
lorem property taxes. (*Gloucester Ferry Co.* v. *Pennsylvania,*
114 U.S. 196, 206 [5 S.Ct. 826, 29 L.Ed. 158] ; *Old Dominion
Steamship Co.* v. *Virginia,* 198 U.S. 299, 305-306 [25 S.Ct.
686, 49 L.Ed. 1059] ; *Pullman's Palace Car Co.* v. *Pennsyl-
vania,* 141 U.S. 18, 22-23 [11 S.Ct. 876, 35 L.Ed. 613] ; see
also *Wheeling etc. Transportation Co.* v. *Wheeling,* 99 U.S.
273, 279-280 [25 L.Ed. 412].) Once their situs is determined,
a state may apply its own tax rate and collection procedures.
It is idle here to discuss the pros and cons of national uni-
formity. It could be achieved only if the states were declared
powerless to tax instrumentalities of foreign commerce at
all or were empowered to tax them only pursuant to federal
legislation.

The issue is whether there is discrimination against foreign
commerce. Obviously there is no discrimination if a state
taxes migratory property used in such commerce in the same
way it taxes migratory property used in interstate commerce.
Moreover, it precludes discrimination against interstate com-
merce. Plaintiff nevertheless contends that since the United
States Supreme Court cannot compel foreign countries to
apportion their taxes by taking into account the absences
from home of their domiciliaries' migratory property, taxa-
tion here even on an apportioned basis may lead to discrimina-
tory cumulative burdens on foreign commerce. This argument
erroneously attributes to such taxation the risk of discrimina-
tion. Actually it is attributable to the freedom of foreign
countries, not permitted to our own states, to adopt rules
of their own that can result in multiple burdens. The court
cannot prevent foreign countries from taxing instrumentalities
of foreign commerce owned by their domiciliaries even if
those instrumentalities are permanently located here, just as
it cannot prevent foreign countries from taxing American
aircraft temporarily abroad even though they have been taxed
at full value at the domicile of their owners here. It is with-
out power to compel independent nations to adopt a uniform

---

[1]"No State shall, without the consent of the Congress, lay any Duty
of Tonnage. . . ." (U.S. Const., art. I, § 10, cl. 3.)

nondiscriminatory system of taxation. It does not follow that the states must forego the power to impose taxes that are not in themselves discriminatory. It bears noting that Congress remains free to prohibit altogether state taxation of instrumentalities of foreign commerce. Alternatively, treaties could govern such taxation to preclude the risk of discrimination.

Plaintiff also contends that for purposes of ad valorem taxation, aircraft flying in foreign commerce are logically indistinguishable from ships sailing the high seas and hence taxable only at the domicile of their owners. When the home-port rule was formulated for the taxation of ships in interstate as well as foreign commerce, there had yet to be developed the concept of taxation on an apportioned basis. (See *Ott* v. *Mississippi etc. Barge Line*, 336 U.S. 169, 173 [69 S.Ct. 432, 93 L.Ed. 585] ; *Ayer & Lord Co.* v. *Kentucky*, 202 U.S. 409, 421 [26 S.Ct. 679, 50 L.Ed. 1082] ; *Southern Pacific Co.* v. *Kentucky*, 222 U.S. 63, 69 [32 S.Ct. 13, 56 L.Ed. 96] ; *St. Louis* v. *Wiggins Ferry Co.*, 11 Wall. (U.S.) 423, 431-432 [20 L.Ed. 192] ; *Morgan* v. *Parham*, 16 Wall. (U.S.) 471, 478 [21 L.Ed. 303] ; *Gloucester Ferry Co.* v. *Pennsylvania*, 114 U.S. 196, 206 [5 S.Ct. 826, 29 L.Ed. 158] ; *Hays* v. *Pacific Mail Steamship Co.*, 17 How. (U.S.) 596, 597-599 [15 L.Ed. 254] ; *Old Dominion Steamship Co.* v. *Virginia*, 198 U.S. 299, 305 [25 S.Ct. 686, 49 L.Ed. 1059].) The rule was abandoned in favor of apportioned taxes as to vessels plying inland waters in *Ott* v. *Mississippi etc. Barge Line*, 336 U.S. 169 [69 S.Ct. 432, 93 L.Ed. 585]. (See also *Standard Oil Co.* v. *Peck*, 342 U.S. 382, 384 [72 S.Ct. 309, 96 L.Ed. 427, 26 A.L.R.2d 1371].) In leaving open the question of ocean carriage, the court in no way suggested that the taxation of either ocean carriage or inland carriage would depend upon whether it was interstate or foreign commerce. Thereafter, in *Braniff Airways, Inc.* v. *Nebraska State Board of Equalization*, 347 U.S. 590 [74 S.Ct. 757, 98 L.Ed. 967], when the analogy between the high seas bordering the nation and the airspace above the nation was urged against apportioned taxation of aircraft, the court nevertheless held that aircraft flying in interstate commerce could be taxed on an apportioned basis. This court adopted the same rule with respect to aircraft flying in foreign commerce in *Flying Tiger Line, Inc.* v. *County of Los Angeles*, 51 Cal.2d 314 [333 P.2d 323]. (See also *Slick Airways* v. *County of Los Angeles*, 140 Cal.App.2d 311, 315 [295 P.2d 46].)

In the Flying Tiger case all members of the court agreed that aircraft flying in foreign commerce could not be taxed at full value at the domicile of the owner in California if they also had attained a taxable situs elsewhere. In contrast, the majority in the present case invoke the home-port doctrine for the conclusion that aircraft regularly flying into California from the foreign domiciles of their owners attain no taxable situs here and that taxation on an apportioned basis is therefore unconstitutional. Rationally, however, the home-port doctrine should apply to all aircraft regularly flying in foreign commerce or to none. If the home-port doctrine is applicable to all aircraft regularly flying in foreign commerce, the Flying Tiger case must be overruled.

The Braniff case broke away from the home-port doctrine when it upheld an apportioned tax on aircraft flown in interstate commerce. There is no more reason to invoke the doctrine for aircraft regularly flying in foreign commerce and bearing an identical relationship to the nondomiciliary state into which they fly. If as plaintiff contends, aircraft cannot logically be distinguished from ships, it is the home-port doctrine, not the Braniff decision, that must give way.

Plaintiff contends, further, that the treaties between the United States and the Scandinavian countries with respect to double taxation preclude ad valorem property taxation of its aircraft in California. (See Convention and protocol between the United States of America and Sweden respecting double taxation, dated March 23, 1939, ratified August 2, 1939, proclaimed December 12, 1939, and effective January 1, 1940, 54 Stat. 1759, T.S. No. 958, 199 L.N.T.S. 17; Convention between the United States of America and Denmark respecting double taxation, dated May 6, 1948, and effective December 1, 1948, 62 Stat. 1730, T.I.A.S. No. 1854; Convention between the United States of America and the Kingdom of Norway for the avoidance of double taxation, dated June 13, 1949, 2 U.S.T. [1951] pt. 2, p. 2323, T.I.A.S. No. 2357; 2 U.S.T. [1951] pt. 2, p. 2353, T.I.A.S. No. 2358.) It notes that each treaty provides that income from the operation of aircraft shall be taxed only in the home country of such aircraft (Treaty with Denmark, art. V; Treaty with Norway, art. V; Treaty with Sweden, art. IV). It contends that this policy of reciprocity on taxation of income connotes a like reciprocity as to local property taxation. There is no merit in plaintiff's contention. The draftsmen of the treaties were

familiar with both national and local taxation of property as well as of income (Treaty with Sweden, art I; Treaty with Denmark, arts. I, XVI; Treaty with Norway, art. I), and they carefully specified the taxes to which the treaties applied and the limitations on the taxing powers of the respective nations. Under these circumstances it is not reasonable to infer that restrictions on income taxation connoted restrictions on property taxation; such an inference would require reading provisions into the treaties that were knowingly omitted.

It is contended, however, that article XIII of the Swedish treaty makes the rule governing income taxation applicable to the property taxes imposed on the Swedish-owned aircraft in this case. Article XIII provides:

"In the case of taxes on property or increment of property the following provisions shall be applicable:

" (1) If the property consists of: (a) Immovable property and accessories appertaining thereto; (b) Commercial or industrial enterprises, including maritime shipping and air transport undertakings; the tax may be levied only in that contracting State which is entitled under the preceding Articles to tax the income from such property.

" (2) In the case of all other forms of property, the tax may be levied only in that contracting State where the taxpayer has his residence or, in the case of a corporation or other entity, in the contracting State where the corporation or other entity has been created or organized.

"The same principles shall apply to the United States capital stock tax with respect to corporations of Sweden having capital or other property in the United States of America."

Article XIII must be read together with article I, which provides:

"The taxes referred to in this Convention are:

" (a) In the case of the United States of America: (1) The Federal income taxes, including surtaxes and excess-profit taxes. (2) The Federal capital stock tax.

" (b) In the case of Sweden: (1) The National income and property tax, including surtax. (2) The National special property tax. (3) The communal income tax.

"It is mutually agreed that the present Convention shall also apply to any other or additional taxes imposed by either contracting State, subsequent to the date of signature of this Convention, upon substantially the same bases as the taxes enumerated herein. . . ."

Article I thus excludes local property taxation in the United States from the ambit of the treaty and makes clear, as the Senate Foreign Relations Committee stated in urging ratification of the treaty, that "the United States makes no agreement respecting any of our State or local taxes." (Report of the Senate Foreign Relations Com., Exec. Rep. No. 18, 76th Cong., 1st Sess. 1939; see also Bittker and Ebb, Taxation of Foreign Income [1960], p. 512.) Had it been the intention to include such taxes, they would have been specifically mentioned as were the Swedish national property taxes and communal income tax. A matter so vital as restrictions on the taxing power of the states and their subdivisions would hardly have been left to implication from the provisions of article XIII, which are directly referable to Swedish property taxes and the United States capital stock tax.

An interpretation of article XIII as applicable only to the taxes defined in article I does not render the general language of article XIII governing property taxation meaningless insofar as the United States is concerned, for that language states the principles that shall also apply to the United States capital stock tax or "any other or additional taxes imposed by [the United States] . . . subsequent to the date of signature of this Convention, upon substantially the same bases. . . ." (Art. I.) Such an interpretation gives effect to both articles and avoids conflict between them. (See *City of Long Beach* v. *Vickers*, 55 Cal.2d 153, 162 [10 Cal.Rptr. 359, 358 P.2d 687]; *Hough* v. *McCarthy*, 54 Cal.2d 273, 279 [353 P.2d 276].)

Finally, plaintiff contends that the Legislature has not provided for the taxation of aircraft on an apportioned basis. Section 404 of the Revenue and Taxation Code provides that "All taxable property, except State assessed property, shall be assessed by the assessing agency of the taxing agency where the property is situated." (See also Rev. & Tax Code, §§ 201, 405.) The word "situated" in this section refers not to mere physical presence on tax day, but to the situs of property within the state necessary to give jurisdiction to tax. (*Brock & Co.* v. *Board of Supervisors*, 8 Cal.2d 286, 289-290 [65 P.2d 791, 110 A.L.R. 700].) Since a properly apportioned part of migratory property regularly used in interstate or foreign commerce in the state has such a situs, the Legislature has provided for its assessment and taxation. (See *Flying Tiger Line, Inc.* v. *County of Los Angeles*, 51

Cal.2d 314 [333 P.2d 323]; *Slick Airways* v. *County of Los Angeles,* 140 Cal.App.2d 311 [295 P.2d 46].)

It bears emphasis that this case involves, not the wisdom of local taxation of foreign aircraft flying in foreign commerce, but the question whether the United States Constitution prohibits a state from taxing such aircraft as it taxes other property that comes into the state. When, as here, there is no such constitutional prohibition, this court has no choice but to uphold the state constitution and statutes. It is not for us to determine whether reciprocal exemptions away from home and exclusive taxation at the domicile would foster commerce, simplify tax administration, and fairly divide tax revenues among the jurisdictions that aircraft link. Such a decision involves policies that properly can be crystallized only in legislation or treaties. A court ventures beyond its appropriate bounds when it crystallizes its own views of tax policy as constitutional doctrine.

Gibson, C. J., concurred.