[S.F. No. 23409. May 5, 1977.]

Estate of INEZ G. FASKEN, Deceased.
KENNETH CORY, as State Controller, Petitioner and Appellant, v.
DAVID FASKEN, as Executor, etc., Objector and Respondent.

COUNSEL

Myron Siedorf, Milton D. Harris, Edwin Rosenthal and William F. Seeley for Petitioner and Appellant.

Mullins, Wise & Dickman, Sullivan, Roche & Johnson, Vincent J. Mullins, Richard H. Wise and Norbert J. Dickman for Objector and Respondent.

## Opinion

**WRIGHT, J.**\*—The State Controller appeals from an order fixing inheritance taxes in the matter of the estate of Inez G. Fasken, who died in 1968 while a resident of California. Decedent devised and bequeathed her entire estate, consisting of real and tangible personal property located in California and Texas, to her son David Fasken, the executor herein. He objected to the report of the inheritance tax referee purporting to determine death taxes due pursuant to provisions of the Revenue and Taxation Code. The court sustained the objections and fixed the tax at an amount $463,858 less than that claimed by the Controller. The estate has paid the tax as so fixed.

At issue is the validity of the California procedure for calculation of that element of the tax which arises out of a federal "credit" of a portion of the federal estate tax, when such credit is allocable to California and one or more other states. The California procedure is prescribed in a regulation which is set out in the margin.[1] We have concluded for reasons which follow that the regulation infringes jurisdictional limitations under federal due process concepts and that the trial court fixed the tax at its jurisdictional limit. We accordingly affirm the judgment.

Because this case springs from a complicated and evolving relationship between federal and state tax law which empowers California to

---

\*Retired Chief Justice of California sitting under assignment by the Acting Chairman of the Judicial Council.

[1]California Administrative Code, title 18, chapter 2.5, subchapter 1, regulation 13441-13442 (hereafter "regulation") reads in relevant part as follows: "In a case where a decedent leaves property the transfer of which is subject to the Inheritance Tax Law of this State, and leaves other property which is subject to the inheritance tax laws of other states, and the total of the taxes imposed by all of the states (excluding any additional or pick-up tax from any state's tax) is less than the maximum state tax credit allowed against the federal estate tax on the total estate by the federal estate tax law, an additional tax will be imposed by California in an amount which bears the same ratio to the difference between the total of the taxes imposed by all of the states and the maximum state tax credit as the net value of the property subject to the Inheritance Tax Law of this State bears to the net value of the property subject to the inheritance tax laws of all the states. . . ."

"pick up" tax revenue made available through a federal credit, it is helpful in the ascertainment of congressional and legislative intent to review pertinent statutory and case law developments in this area.

### Development of Rules Relative to "Pick-up" Taxes

Since 1916 section 2001 of the Internal Revenue Code[2] has imposed a federal estate tax on all specifically nonexempt (see Int. Rev. Code, §§ 2011-2014, 2052-2056) property owned by persons residing in the United States at the time of their death. In the early years following enactment of the federal estate tax, a backlash of opposition emerged in Congress and among various other high placed government officials to the very concept of the federal government taxing a person's property at death.[3] Concurrent with this attitude of general resentment for the federal government's incursion into an area providing "a traditional source of revenue to the states" (Turner, *The Gross Estate and the Death Tax Credit* (1971) 28 Wash. & Lee L.Rev. 254, 257 [hereafter cited as *Turner*]), several states nevertheless repealed long-standing death tax statutes,[4] "this being done to induce wealthy persons to move within their borders." (*Cogburn* at p. 123.)

---

[2]Although the federal government's initial venture into the death tax field dates to a Revolutionary War era attempt to collect stamp tax revenue (Lowndes, Kramer & McCord, Federal Estate and Gift Taxes (3d ed. 1974) § 2.1, p. 7 [hereafter cited as *Lowndes*]), Congress enacted a modern version of the federal estate tax in 1916. (Act of Sept. 8, 1916, ch. 463, § 201, 39 Stat. 777.) Through a series of 20th century statutory amendments, Congress increased the scheduled federal estate tax rate from a maximum of 16 percent in 1916 to its present maximum of 77 percent. (Stephens, Maxfield, & Lind, Federal Estate and Gift Taxation (3d ed. 1974) 1-2; 1954 U.S. Code, Cong. & Admin. News, pp. 1441, 5105.)

[3]Treasury Secretary Andrew Mellon and numerous state governors who testified before the House Ways and Means Committee advocated complete elimination of the federal government's role in estate taxation. (See Hearings before Committee on Ways and Means of the U.S. House of Representatives, relative to the Revenue Act of 1924, p. 1 et seq.; see also Cogburn, *The Credit Allowable Against The Basic Federal Estate Tax for Death Taxes Paid to State Statutes Enacted to Take Advantage Thereof—Constitutional Difficulty and Some Suggested Solutions* (1952) 30 N.Car.L.Rev. 123 [hereafter cited as *Cogburn*]; see also *Lowndes*, § 20.3, p. 585.)

[4]As used throughout this opinion the term "estate tax" designates the tax assessed by the federal government against a decedent's estate pursuant to Internal Revenue Code section 2001; the term "credit for state death taxes" or "federal credit for state death taxes" designates the credit to be applied to the estate pursuant to Internal Revenue Code section 2011; the term "state death tax" or "death tax" designates the sum total of all taxes assessed against a decedent's estate by a state; the term "inheritance tax" designates that portion of the death tax which a state assesses against property located within its borders and included in a decedent's estate without consideration for the pick-up tax as defined below; the term "pick-up tax" designates that portion of the death tax which a state may assess in response to the federal credit for state death taxes and together with the inheritance tax constitute the sum total of state death taxes; the term

Congressional response took form in the Revenue Act of 1924 (ch. 234, § 301(b), 43 Stat. 253, 304) giving birth to what is now commonly referred to as the federal estate credit for state death taxes. (Int. Rev. Code, § 2011.) ██ Section 2011, subdivision (a) of the Internal Revenue Code permits legal representatives of estates to deduct from the total federal estate tax obligation[5] a limited, scheduled[6] credit for all death taxes actually paid[7] to any state on account of property taxable as part of the gross federal estate.[8] Architects of the credit clearly intended individual states to benefit from its creation, for section 2011 assures states a certain minimum of tax revenue at the expense of the federal treasury.

The original version of section 2011 set the federal state death tax credit at a maximum of 25 percent. Although a decedent's estate located in a state without a death tax would still incur the same federal liability as an estate situated in a state which imposed the tax, existence of the federal credit enabled all states for the first time to share in receipt of federally assessed tax revenue merely by enacting or amending their

---

"credit differential" designates the differential between the credit for state death taxes and the total of all state inheritance taxes.

The parties have raised no issues relative to the taxable situs of intangible property, if any. For purposes of our resolution herein we assume that the property of the estate consists of tangible property in California and other tangible property in Texas, and our discussions relate only to tangible properties.

[5]Section 2011, subdivision (a), provides, in relevant part: "The tax imposed by section 2001 shall be credited with the amount of any estate, inheritance, legacy, or succession taxes actually paid to any State or the District of Columbia, in respect of any property included in the gross estate . . . ."

Deduction of the credit for state death taxes under section 2011 represents only one of five credits provided by the code. A decedent's estate may also deduct from the total federal estate tax bill varying amounts for federal gift taxes (§ 2012), estate tax on prior transfers (§ 2013), foreign death taxes (§ 2014) and death taxes on remainders (§ 2015).

[6]See generally section 2011, subdivision (b). Beginning with a taxable estate (gross estate less exemptions and expenses) in excess of $40,000, section 2011, subdivision (b), provides for a credit for state death taxes of 0.8 percent. The largest percentage credit, 16 percent, is reached on a taxable estate totalling more than $10,040,000.

[7]To qualify for a credit under section 2011, subdivision (a), a decedent's estate must actually incur some federal estate tax liability. The allowance of comparatively high federal estate tax exemptions enable relatively small estates to escape a federal tax even though there may be a substantial state death tax. Estates which fall into this category do not qualify for the federal credit and the state cannot assess a pick-up tax. (See Maxwell, Tax Credits and Intergovernmental Fiscal Relations (1962) p. 25 [hereafter cited as *Maxwell*].)

[8]This limitation means that death taxes paid on property subject to state but not to federal tax fail to qualify for the section 2011, subdivision (b) credit. (Treas. Reg. § 20.2011-1, subd. (a); *Second National Bank of New Haven* v. *United States* (2d Cir. 1970) 422 F.2d 40.)

existing laws to pick up the federal credit.[9] Despite this incentive for states to take advantage of available tax revenue, dilatory and even contrary legislative action by some states quickly dispelled any notion that the 25 percent credit would provide a panacea for alleviation of resentment to federal government involvement or elimination of inter-state death tax competition.[10] One commentator explained the situation that prevailed following passage of the 25 percent credit in 1924: "[D]ue to the action of some states, it became apparent that if this matter were left solely to the states, competition would arise among the several states to revoke or lower their death taxes in an attempt to lure wealthy elders into those states with lower or non-existent death tax burdens." (*Turner,* at pp. 257-258.) In 1926, therefore, Congress raised the federal tax credit to a maximum level of 80 percent (4 CCH Inheritance, Estate and Gift Tax Reporter, § 2500, p. 80,421) as a further attempt "to induce states to enact laws imposing death taxes." (*Cogburn,* at p. 124.)

By more than tripling the maximum available federal state death tax credit, Congress achieved a lasting solution to the twin problems of interstate death tax competition and general opposition to federal death taxation.[11] When state legislatures finally realized that the federal government actually intended to divert from its own treasury to individual state coffers vast sums of federally assessed tax revenue, the response was overwhelming: interstate death tax competition soon vanished, and at the present time every state in the nation except Nevada

[9] To make available the maximum death tax revenue states previously lacking statutory authority were encouraged to enact laws designed to pick up at least a portion of the section 2011 federal credit. States already possessing death tax statutes at the time Congress created the federal credit found themselves exploring whether existing statutes adequately assured receipt of their entire federal credit share; if found to be inadequate, states could amend their death tax laws to pick up the shortfall between extant death taxes and the maximum available credit under section 2011. However, as Congress increased both federal credit percentages (*Lowndes,* at § 20.3, p. 585) and absolute federal estate tax liability (see fn. 2, *ante*), death tax rates failed to keep pace. States currently benefit from the federal credit, therefore, largely because of the differential they are able to pick up; for reference purposes the federal credit picked up by way of supplemental state exactions has been described herein as the pick-up tax. (See fn. 4, *ante.*)

[10] Morton & Cotton, *Limitations on State Jurisdiction to Levy Death Taxes* (1951) 5 Miami L.Q. 449. State legislative action in Florida and Nevada illustrates perhaps the most extreme tactics designed to attract elderly, tax-conscious residents. Those states, by constitutional amendments, forbade the enactment of death taxes hoping that their tax havens and climates would attract rich domiciliaries. (*Maxwell,* at p. 21; see also Stephens et al., Federal Estate and Gift Taxation, *supra,* 3-7 to 3-8.)

[11] *Cogburn,* at pages 124 and 125, concludes that these two issues overshadowed all others, adding: "Fear of multiple State taxation was not an actuating factor [in passage of the credit]." (See also Hearings before Committee on Ways and Means of the House of Representatives of the U.S., relating to the Revenue Act of 1924, p. 303.)

and the Dakotas levies death taxes which at least exhaust the state death tax credit. (4 CCH Inheritance, Estate and Gift Taxes Reporter, Multistate Compendium, pp. 70,111 - 70,633: ¶ 1100, p. 80,041.) Enactment of a state death tax credit enabling states to acquire all but 20 percent of estate tax revenues previously retained entirely by the federal government, moreover, placated critics of federal involvement in the death tax area by satisfying their "clamor for the abolition of Federal death taxation." (*Cogburn,* at p. 125.) Having placated its critics, however, Congress wasted little time in enacting an additional estate tax not subject to any credit, and the current credit as now scheduled in Internal Revenue Code section 2011 results from a combination of the two estate taxes in the 1954 recodification of the code with the credit never exceeding 16 percent of the combined tax. (See fn. 6, *ante.*)

Obviously cognizant of federal determination to furnish states with a larger portion of estate tax revenue, our Legislature adopted a pick-up tax in 1927 (Rev. & Tax. Code, §§ 13441, 13442) calculated to assure this state its full share of the credit for state death taxes.[12] If an inheritance tax obligation falls short of the maximum credit for state death taxes scheduled in section 2011 of the Internal Revenue Code, section 13441 of the Revenue and Taxation Code imposes a pick-up tax equal to the difference. ██ Section 13441, moreover, has been construed in the absence of multistate claims to the federal credit as vesting the state with an independent right to receive the entire credit differential between the allowable[13] state death tax credit and state death taxes, with or without the benefit of the enabling authority of section 2011 of the Internal Revenue Code, irrespective of whether a decedent's estate

---

[12]The current versions are found in sections 13441 and 13442 of the Revenue and Taxation Code.

Section 13441 reads as follows: "In the event that a Federal estate tax is payable to the United States in a case where the inheritance tax payable to this State is less than the maximum State tax credit allowed by the Federal estate tax law, a tax equal to the difference between the maximum credit and the inheritance tax payable is hereby imposed."

Section 13442 provides: "If no inheritance tax is payable to this State in a case where a Federal estate tax is payable to the United States, a tax equal to the maximum State tax credit allowed by the Federal estate tax law is hereby imposed."

[13]Although federal (Int. Rev. Code, § 2011, subd. (b)) and state (Rev. & Tax. Code, §§ 13441, 13442) statutes employ the word "allowed" to define the amount of federal credit returnable to the states, in *Estate of Good* (1963) 213 Cal.App.2d 45, 48-49 [28 Cal.Rptr. 378], the court held that the word really refers to "allowable" credit rather than credit "actually allowed" by the federal government, as alleged by decedent's executors. California's practicing bar is now so instructed: "[T]he state's right to additional tax [the credit differential] is *not* dependent on the actual allowance of the credit by the federal government." (Cal. Inheritance Tax Practice (Cont.Ed.Bar 1973) § 1327, p. 332; italics added.)

waived the credit and paid the full estate tax to federal authorities,[14] and even though compliance with the state's demand forces the estate to assume the onus of double taxation.[15] (*Estate of Good, supra,* 213 Cal.App.2d 45, 48-50; see also *Estate of Callaway* (1968) 263 Cal.App.2d 795, 798-801 [69 Cal.Rptr. 921]; *Estate of Amar* (1967) 255 Cal.App.2d 404, 407-409 [63 Cal.Rptr. 444]; accord *Wells* v. *Gay* (Fla. 1952) 58 So.2d 690; *State* v. *Weiss* (1943) 141 Tex. 303 [171 S.W.2d 848, 147 A.L.R. 460]; *Matter of Thalmann* (1941) 177 Misc. 1055 [32 N.Y.S.2d 695].)

### The Conflict in Claims to the State Death Tax Credit

Although *Good, Amar, Callaway* and other decisions by sister states firmly establish state individual entitlement to the full credit differential, even when both federal and state payments are thereby forced upon a taxpayer, these cases do not by themselves substantiate the Controller's present claim for unpaid taxes. The executor in the instant case does not dispute a state's authority to levy a pick-up tax covering the full credit differential when all tangible estate property is located in one state. He argues instead that California purports to tax only a pro rata share of the full credit differential in an estate having multistate property, but utilizes a constitutionally impermissible apportionment to determine that share.

The regulation urged by the Controller as warranting the challenged procedures was promulgated in its present form in 1945. It purports to

---

[14]In *Estate of Good* (1963) 213 Cal.App.2d 45 [28 Cal.Rptr. 378], because of the manner in which certain federal estate tax credits were to be calculated, it was to the estate's advantage to fix at the maximum the federal estate tax obligation by foregoing the credit for state death taxes (Int. Rev. Code, §§ 2001, 2011) if by so doing the estate was relieved of the obligation for the state's pick-up tax (Rev. & Tax. Code, § 13441). To require the estate to pay both the undiminished federal estate tax and California pick-up tax, the estate argued, would require an unconstitutional double payment of the $17,527.90 credit differential. The court nonetheless rejected the estate's contention and announced California's independent right to the full credit differential even though the estate had not claimed the credit for state death taxes as provided in Internal Revenue Code section 2011.

[15]In common parlance, taxing the same asset twice is taken to mean double taxation. Legally, however, the mere fact that two separate taxing entities, such as California and Texas or the federal government and California, may levy taxes on the same asset, and thus tax double, does not necessarily result in a constitutional transgression. In *Good* the court explained: "To constitute [objectionable or prohibited double] taxation, the two taxes must be imposed on the same property, *by the same state or government,* during the same taxing period, for the same purpose. Indirect duplicate taxation is not objectionable." (*Estate of Good, supra,* 213 Cal.App.2d 45, 51, italics added; see also 1 Cooley, Taxation (4th ed.) § 223 et seq.)

implement the same federal objective of picking up tax revenue made available to states as do the statutes adopted by legislative action in 1927. It is concerned, however, with only those particular estates, like decedent's in the present case, which consist of both California and out-of-state property. The governing statutes, on the other hand, do not expressly deal with such particular situations. The regulation, accordingly, provides for the application of statutes in a particular situation in which the statutes are silent.[16]

In the instant case California exercises uncontested jurisdiction over estate property having a value of $11,384,060.34 representing 45.313 percent of the total worth of the estate. Texas assessed "nonresident" inheritance taxes against property having a worth of $13,631,515.16, representing of the total worth 54.6869 percent of the estate.[17] Following the inheritance tax referee's report of death taxes due the State of California in the amount of $2,007,765.19 ($1,509,279.32 in inheritance taxes and $498,485.87 in pick-up taxes) the executor complained inter alia that should the pick-up tax be fixed in the reported amount it would constitute "a deprivation of . . . property without due process of law" in violation of state and federal constitutional guarantees.[18] The court fixed the pick-up tax at $34,627.87, $463,858 less than that reported by the referee.

---

[16]To attain a perspective of California's regulation, a brief overview of the veritable *melange* of pick-up taxes in other states which currently exert inconsistent, often overlapping claims against the state death tax credit may be useful.

State efforts to absorb, or pick up, the state death tax credit fall, with roughly equivalent frequency, into one of three general categories. (See 4 CCH Inheritance, Estate and Gift Tax Reporter, ¶ 1100, p. 80,041, ¶ 2560, pp. 80,423-80,424; Multistate Compendium, pp. 70,111-70,633.) States in the first category, after subtracting from the amount allowable by Internal Revenue Code section 2011 as the state death tax credit all or a portion of the inheritance taxes of all other states, absorb the entire credit differential without apportioning it with those other states which exercise jurisdiction over some portion of the decedent's assets. A second category of states determine the percentage of decedent's overall estate lying within the resident state's taxable jurisdiction and then simply assess a "gross" tax equivalent to such percentage of the total of the credit for state death taxes, without reference to the amount of inheritance taxes assessed by other states. The third category, including California, follow a procedure which requires first subtracting from the scheduled maximum state death tax credit the inheritance taxes of all states wherein some portion of decedent's property is located, and then apportioning such credit differential according to the percentage of property owned by decedent in each state.

[17]At the time of her death a vast majority of decedent's Texas assets consisted of working and nonworking interests in mineral deposits of an undisclosed nature.

[18]In addition to the due process contention now raised on appeal, the executor made in the trial court three nonconstitutional objections to the referee's report, none of which has survived for consideration on appeal.

The executor has paid the entire sum of $1,863,291.14 in death taxes as assessed by Texas authorities. According to the executor the estate's total California death tax liability should amount to no more than the credit for federal state death taxes ($3,407,198.33) less the total death taxes assessed by and paid to Texas ($1,863,291.14), that amount being $1,543,907.19. As the California inheritance tax represents $1,509,279.32 of this amount, the pick-up tax should be the balance, $34,627.87. The executor relies on substantive due process limitations as requiring the analysis he urges, and we next examine such limitations.

### Jurisdictional Due Process Limitations on a State's Power to Levy Death Taxes

The executor focuses his attack on what he claims to be jurisdictional excesses in the pick-up tax as calculated pursuant to the regulation. Our research reveals that the United States Supreme Court has on only three occasions addressed itself to issues bearing on the constitutionality of death taxes. In two of such instances the court held there to be a constitutional infringement when a state law attempted to impose on out-of-state property either a direct or an indirect tax which would interfere with the right of the state in which such property was located to collect revenue attributable thereto.[19]

In *Frick* v. *Pennsylvania* (1925) 268 U.S. 473 [69 L.Ed. 1058, 45 S.Ct. 603, 42 A.L.R. 316], the high court invalidated a segment of Pennsylvania's death tax law which sought to impose exactions on tangible property, the largest part of which consisted of a New York City art collection. Acknowledging that the issue was one of first impression, the court held that "while a State may so shape its tax laws as to reach every object which is under its jurisdiction, it cannot give them any extraterritorial operation." (*Id.*, at p. 489 [69 L.Ed. at p. 1062].) *Frick* thus stands for the proposition that a *direct* tax on out-of-state taxable personal and real

---

[19]In the third case, *Maxwell* v. *Bugbee* (1919) 250 U.S. 525 [63 L.Ed. 1124, 40 S.Ct. 2], the court upheld a New Jersey death tax which took into account the full value of a decedent's multistate assets as the basis for fixing the *rates* for calculating New Jersey death taxes levied on property within the borders of that state. Rejecting the contestant's claim that this method of computing the tax resulted in a deprivation of property without due process of law "because it in effect taxes property beyond the jurisdiction of the State" (*id.*, at p. 539 [63 L.Ed. at p. 1131]), the court bestowed its blessing on a rule which permitted states to set death tax rates reflective of a decedent's total estate, wherever situated and irrespective of actual jurisdiction to tax. There is no challenge in the instant case to California's rate of taxation. What is challenged is California's right to apply its rate to property outside its borders.

property constitutes a reach of constitutionally impermissible dimensions.

In its final decision dealing with the permissible reach of a state death tax the Supreme Court denounced a 30 percent emergency tax enacted to fund World War II rehabilitation projects and calculated as a surtax on the Wisconsin death tax. (*Treichler* v. *Wisconsin* (1949) 338 U.S. 251 [94 L.Ed. 37, 70 S.Ct. 1].) In *Treichler* there was a federal credit for state death taxes of $630,709.62. The Wisconsin inheritance tax was $220,682.12 and the combined inheritance taxes on property of the decedent in Florida and Illinois were $57,325.71, leaving a total credit differential of $352,701.79. Wisconsin claimed the whole of the credit differential as a pick-up tax, designated by the Wisconsin statute as an "estate tax." No proper challenge was made to such claim, and the Supreme Court held *only* that the *emergency tax* offended due process. That tax was calculated as 30 percent of the Wisconsin death tax (the sum of the inheritance and pick-up taxes), but because Wisconsin purported to pick up *all* of the credit differential its death tax was the equivalent of the federal credit for state death taxes less the combined inheritance taxes of Florida and Illinois.

Although the basis for the disapproval of the Wisconsin emergency tax is not clearly stated, we read the opinion to hold that because the federal credit for state death taxes is "rated and measured by the entire estate, regardless of situs," no state can assert a claim to *all* of that credit when some taxable portion of the estate is located in another state. (*Treichler* v. *Wisconsin, supra,* 338 U.S. 251, 254 [94 L.Ed. 37, 41].) Likewise, Wisconsin could not measure its emergency tax as a percentage of the whole of that credit. It did not, of course, measure its emergency tax as a percentage of the whole of that credit, but rather as a percentage of the whole of that credit *less* the inheritance taxes assessed by Florida and Illinois. But the Supreme Court was nevertheless of the view that even though Wisconsin had made an allowance for the Florida and Illinois inheritance taxes, such allowance had "no necessary relation to the proportion of property outside Wisconsin." (*Id.,* at p. 255 [94 L.Ed. at p. 42].) Although it declined to express any opinion thereon, the Supreme Court noted that a "different question might be presented . . . if the statute in question authorized" computation to begin with only that precise portion of the federal credit for state death taxes which was

attributable to tangible property in Wisconsin. (*Id.,* fn. 3 [94 L.Ed. at p. 42].) The court concluded that Wisconsin had "authorized a tax on property rated and measured in part by tangible property, the situs of which was outside Wisconsin. . . . Wisconsin's statute may be more sophisticated than Pennsylvania's, but in terms of ultimate consequences this case and the *Frick* case are one."[20] (*Id.,* at p. 256 [94 L.Ed. at p. 42].)

After remand from the United States Supreme Court, Wisconsin recomputed its emergency tax. It determined that portion of the federal credit for death taxes attributable only to property within the borders of Wisconsin which basis it used for computation of the emergency tax. (See *Estate of Miller* (1950) 257 Wis. 439 [43 N.W.2d 428].) In a per curiam decision the United States Supreme Court affirmed the Wisconsin Supreme Court judgment on remand, insofar "as the appeal attacks the validity of the computation of appellant's tax under the Wisconsin Emergency Tax on Inheritances." (*Treichler, Executor v. Wisconsin* (1950) 340 U.S. 868 [95 L.Ed. 633, 71 S.Ct. 120].) Insofar as the appeal attacked the Wisconsin pick-up tax, however, the appeal was dismissed, "that portion of the judgment of the Wisconsin Supreme Court resting on an adequate nonfederal ground." (*Id.*)[21]

Neither the United States Supreme Court *Treichler* opinions nor the reported opinions of the Wisconsin Supreme Court (*In re Miller's Estate*

---

[20]As presented to us, we are concerned with only the jurisdictional basis for measuring the California pick-up tax, that is, the value of the property over which California may properly assert jurisdiction. No issue is raised as to the *rate* of taxation, that is, the portion of that taxable basis which may be assessed as a tax. The foregoing quotations from *Treichler* suggest that the Wisconsin tax failed on constitutional grounds because it was both "rated and measured" on property not within Wisconsin's borders. Although such language may cast some doubt on the continuing validity of *Maxwell* v. *Bugbee, supra,* 250 U.S. 525 (see fn. 19, *ante*), we note that *Frick,* on which *Treichler* purports to rely, expressly reaffirms the *Maxwell* rule. There was, further, no rating problem presented in *Treichler.* Insofar as appears Wisconsin did not attempt to "rate" either its inheritance or pick-up tax on property outside its borders although, as appears in our analysis of the United States Supreme Court decision, it "measured" its pick-up tax on outside property. There likewise was no rating problem in its emergency tax as the statute provides for a flat 30 percent surtax independently of the gross multistate value of the decedent's estate. To the extent that *Treichler* may be deemed to be inconsistent with *Maxwell,* its views are probably dicta (see *Cogburn,* at p. 135), but in any event we are not now concerned with a rating problem.

[21]In the first *Treichler* opinion, the Supreme Court stated that the Wisconsin statute dealing with the pick-up tax "is not under explicit attack here." (*Treichler* v. *Wisconsin, supra,* 338 U.S. 251, 253 [94 L.Ed. 37, 41].) We will hereinafter designate the first and second Treichler opinions as *Treichler I* and *Treichler II,* respectively.

(1948) 254 Wis. 24 [35 N.W.2d 404], and *Estate of Miller, supra,* 257 Wis. 439) disclose the "adequate nonfederal ground" upon which the United States Supreme Court declined to question the propriety of Wisconsin's pick-up tax. It is manifest, however, that although the Wisconsin pick-up tax was not under attack, it necessarily suffered from the same constitutional infirmity which rendered the emergency tax invalid. This follows from the fact that the emergency tax was but a fixed portion of the death tax. If the emergency tax was constitutionally defective because it reached property outside Wisconsin's borders, then the death tax, which was the basis for the measure of the emergency tax, necessarily also reached such outside property. As the inheritance tax component of the death tax was assessed only on property within Wisconsin's borders (see *Treichler* v. *Wisconsin, supra,* 338 U.S. 251, 253 [94 L.Ed. 37, 41]) the remaining component, the pick-up tax, had to have been assessed against property lying at least in part outside Wisconsin. This was recognized by the Wisconsin Supreme Court when, on remand and recomputation of the emergency tax, the court recognized a computation factor which it described as "Wisconsin Estate Tax measured by property out of Wisconsin." (*Estate of Miller, supra,* 257 Wis. 439, 441, fn. 1.) As noted above, the Wisconsin statute assessed the whole of the credit differential as a pick-up tax, although some part of the decedent's estate was located in both Florida and Illinois.

The United States Supreme Court has not since *Treichler II* undertaken to extend, withdraw or explain the limits of due process jurisdictional controls over state death taxes, including pick-up taxes. Because states assert their right to the federal state death tax credit by rules which are independently enacted and generally fail to take into consideration conflicting claims which may be asserted by sister states when multistate property is involved, and because the conflicts have been created by federal legislation which encourages the states to make such claims while not defining the limits thereto, the problem is peculiarly one which the United States Supreme Court can most effectively resolve. Although the high court has failed to act in this area it has indicated a more sympathetic view of the right of states to exact tax revenue in other related areas where formerly they were deemed to be limited by due process concepts. (See, e.g., *Standard Steel Co.* v. *Wash. Revenue Dept.* (1975) 419 U.S. 560 [42 L.Ed.2d 719, 95 S.Ct. 706]; *Nat. Bellas Hess* v. *Dept. of Revenue* (1967) 386 U.S. 753 [18 L.Ed.2d 505, 87 S.Ct. 1389]; *Scripto* v. *Carson* (1960) 362 U.S. 207 [4 L.Ed.2d 54, 80 S.Ct. 52]; *Williamson* v. *Lee Optical Co.* (1955) 348 U.S. 483 [99 L.Ed. 563, 75 S.Ct.

461]; *Braniff Airways* v. *Nebraska Board* (1954) 347 U.S. 590 [98 L.Ed. 967, 74 S.Ct. 757]; *Nelson* v. *Sears, Roebuck & Co.* (1941) 312 U.S. 359 [85 L.Ed. 888, 61 S.Ct. 586, 132 A.L.R. 475]; *U. S.* v. *Carolene Products Co.* (1938) 304 U.S. 144 [82 L.Ed. 1234, 58 S.Ct. 778]; see also *Sea-Land Service, Inc.* v. *County of Alameda* (1974) 12 Cal.3d 772 [117 Cal.Rptr. 448, 528 P.2d 56]; *Scandinavian Airlines Systems, Inc.* v. *County of Los Angeles* (1961) 56 Cal.2d 11 [14 Cal.Rptr. 25, 363 P.2d 25].)

### Jurisdictional Excesses Under the California Regulation

■ It seems clear, as pertinent to the issues at hand, that under prevailing decisions each of several states may levy against an estate consisting of multistate property, an inheritance tax measured by the property within that state's boundaries, the amount of which tax is not limited by or otherwise dependent in any way on the federal credit for state death taxes. Even a single state may levy and collect, without raising a jurisdictional question, an inheritance tax which, by itself, exceeds the federal credit. This is true because the state in assessing a true inheritance tax as defined herein (see fn. 4, *ante*) applies its taxing rate to only in-state property. A state need not apportion that element of its death tax which consists of an inheritance tax so calculated. ■ A different problem is presented, however, when the state levies an inheritance tax which is a lesser amount than the federal credit for state death taxes and then seeks to "pick up" all or a portion of the credit differential when multistate property is involved. The different problem arises because the credit differential is measured by the *total* of multistate properties, and *Frick* teaches us that a state making a claim thereto is limited by that portion attributable to property within that state. The pick-up tax must, accordingly be apportioned.[22] The critical question is how that apportionment is to be made. The executor urges that we must look to the *Treichler* opinions for an answer and, not without some confusion, we next proceed to do so.

---

[22]Although it did not expressly so hold, we have, for reasons appearing above, construed *Treichler I* to stand for the proposition that the pick-up tax must be apportioned. What was actually disapproved in *Treichler I* for want of apportionment, of course, was the Wisconsin emergency tax which was in reality merely a surtax on the unapportioned pick-up tax. As we noted above, if the surtax offended constitutional proscriptions, then the basic tax necessarily suffered the same constitutional infirmities, and we can properly conclude that *Treichler I* stands for the proposition that the pick-up tax must be apportioned if it is to conform to constitutional requirements.

In *net effect* the computation of the pick-up tax as approved by the United States Supreme Court in *Treichler II* started with the federal credit for state death taxes and deducted therefrom that portion of the credit which, because it was attributable to out-of-state property, was unavailable to Wisconsin. The balance of the credit was deemed to be within the jurisdictional reach of Wisconsin. The pick-up tax, accordingly, was calculated to be the difference, if any, between the available credit and the inheritance tax.[23]

We note from our readings of the *Treichler* opinions that the allowable pick-up tax which may be levied by one state in a situation where there is multistate property in a decedent's estate, is not dependent upon the death taxes levied by another state exercising jurisdiction over any of the property involved. Each state according to the *Treichler* formula may properly levy a pick-up tax which is calculated by first apportioning the federal state death tax credit according to the ratio of property which lies within its borders, and then reducing that apportioned credit by its inheritance tax. The balance of the apportioned credit constitutes the pick-up tax.

■ If we apply the *Treichler* formula to the situation at hand, California may levy a pick-up tax which is equal to the federal credit for state death taxes ($3,407,198.33) apportioned to the ratio of property in California (.453131), or $1,543,907.19, less its inheritance tax ($1,509,279.32), or $34,627.87. This is the precise amount of pick-up tax fixed by the trial court. The California regulation, however, produces a

---

[23]The calculation as reported by the Wisconsin Supreme Court is set out in *Estate of Miller, supra,* 257 Wis. 439, 441, footnote 1. Although the calculation as reported, first subtracts out and then adds in the out-of-state inheritance taxes and for that reason appears to be more complex than the simple computation described in the text above, in net effect the calculation as reported in *Estate of Miller* is the same as that related above.

On the basis as related in the text above the computation may be represented as follows:

*Wisconsin Emergency Tax*

| | |
|---|---|
| Federal Credit | $ 630,709.62 |
| 87½ percent attributable to Wisconsin property (representing Wisconsin's inheritance tax of $220,682.13, and $331,188.80, the amount which properly would have been available as a pick-up tax) | $ 551,870.92 |
| 30 percent emergency tax | $ 165,561.28 |

The $165,561.28 emergency tax as calculated above is identical to the sum of the two components of the emergency tax ($66,204.64 and $99,356.64) as computed in *Estate of Miller, supra,* 257 Wis. 439, 441, footnote 1.

larger tax. The computation of that tax, when compared to the computation under the *Treichler* formula, is as follows:

| | | Regulation | Treichler |
|---|---|---|---|
| Federal credit for state death taxes | | $ 3,407,198.33 | $ 3,407,198.33 |
| Less Inheritance Taxes | | | |
| California | $1,509,279.32 | | |
| Texas | 797,826.84 | | |
| | | 2,307,106.16 | |
| Total credit differential available for pick up per regulation | | 1,100,092.17 | |
| Portion of estate located in California | | .453131 | .453131 |
| California share of credit differential (pick-up tax) per regulation | | 498,485.87 | |
| Total federal credit apportioned to California per *Treichler* formula | | | 1,543,907.19 |
| Less California inheritance tax | | | 1,509,279.32 |
| California pick-up tax per *Treichler* formula | | | $ 34,627.87 |

Although the computation under the regulation produces a different and larger pick-up tax than under the *Treichler* formula, it does not necessarily follow that the regulation results in a constitutionally impermissible tax. *Treichler II* holds only that the Wisconsin apportionment does not offend constitutional limitations. But there is no holding that the formula establishes the outer limits of permissible taxation. A different apportionment, even though it may exact a heavier tax in a given situation, would also be constitutionally permissible if in so apportioning the taxing state confines its jurisdictional reach within its own borders. The Controller contends that the California regulation provides for such an apportionment.

If we recognize, as we have, that there are components of the federal credit for state death taxes which California cannot pick up, the problem becomes one of separating out those components with reasonable certainty. It is not enough that the separated components be significant in degree or quantity. It is essential, however, that the quality of the separation or apportionment be such that it results in a rational measure of California's entitlement to claim a portion of the federal credit. Moreover, California's entitlement should depend on factors pertinent to property or apportioned property within California's jurisdictional control. Its entitlement should not depend on how one or more of the other states with a right to levy inheritance or pick-up taxes proceed to do so. Should, for instance, a sister state with some portion of estate property located within its borders elect not to assert its claim for a share of the federal credit, California's entitlement should not thereby be enlarged or otherwise affected as any increased apportionment in California's favor would extend its jurisdictional reach to the sister state's property. With these concepts in mind we proceed to examine the computation under the California regulation.

We note at the outset that while under the *Treichler* formula the federal credit is immediately apportioned, under the regulation the federal credit is reduced by the inheritance taxes involved before it is apportioned. The resulting "total credit differential" does not, however, necessarily represent the total credit available as pick-up taxes. This follows from the fact that states have an almost unlimited right to fix the amount of the inheritance tax at nothing or at an amount which may exceed the federal credit. If Texas, for instance, fixed its inheritance tax at an amount greater than the total federal credit then, under the regulation, California would be entitled to no pick-up tax although some significant portion of the federal credit (which portion may exceed the California inheritance tax) was attributable to California property. Under the *Treichler* formula the amount of the Texas inheritance tax does not affect California's right to pick up its share of the credit differential. Conversely, if Texas assessed no inheritance tax although estate property was located therein, under the regulation the "total credit differential available for pick up" would include credits attributable to estate property located in Texas. California would nevertheless pick up such credits under the computations pursuant to the regulation, and thus impermissibly extend its jurisdictional reach into Texas. Under the *Treichler* formula the failure of Texas to levy an inheritance tax on estate

property located in Texas would not affect California's right to pick up its share of the credit differential.

Although we have dealt only with the extreme situations, it is manifest that there are intermediate impermissible taxing situations under the regulation.[24] It is also apparent that the regulation, while purporting to apportion, does not do so in a manner which truly reflects California's entitlement in every situation. The regulation, in fact, imposes a computation which in one important respect was found wanting in *Treichler I.* Wisconsin had first subtracted from the federal credit the states' inheritance taxes to arrive at a balance which it used to calculate its pick-up and emergency taxes. In commenting on this, the United States Supreme Court noted that such procedure had "no necessary relation to" a proper apportionment of the estate property. (*Treichler* v. *Wisconsin, supra,* 338 U.S. 251, 255 [94 L.Ed. 37, 42].) The California regulation provides for an identical computation in determining the credit differential available for pick up. The reason for the disapproved apportionment in *Treichler I* is thus equally applicable in the instant case, as the regulation is not necessarily related on a jurisdictional ground to California's entitlement to pick up its fair share of the federal credit for state death taxes. The regulation, accordingly, must fail on federal constitutional grounds. ■ It does not follow that the California statutes (Rev. & Tax. Code, §§ 13441, 13442) infringe constitutional prohibitions. The statutory language, unlike the direction contained in the regulation, does not require an interpretation which extends the Controller's reach beyond jurisdictional limits and must be construed to withstand constitutional challenge. The "maximum state tax credit" and "maximum credit" referred to in sections 13441 and 13442 are accordingly deemed to mean that portion of the federal credit for state death taxes which is attributable to California property as determined under the *Treichler* formula.

We have carefully examined the basis upon which the trial court fixed the pick-up tax in the instant case. We are in accord with its analysis of the controlling decisions and conclude that it properly fixed that tax in

[24]In the case at hand for instance Texas would, apart from federal considerations, have levied a relatively small inheritance tax. The effect, under the regulation, would have been to produce a "credit differential available for pick up" which would have been disproportionately large in favor of California. Under the *Treichler* formula the credit differential available for pick up by California, does not vary whatever the Texas inheritance tax.

the amount of $34,627.87, and the total death tax in the amount of $1,509,279.32.

The judgment is affirmed.

Tobriner, Acting C. J., Clark, J., Richardson, J., and Sullivan, J.,* concurred.

**MOSK, J.**—I dissent.

Justice Tom Clark wryly observed in *Holland* v. *United States* (1954) 348 U.S. 121, 128 [99 L.Ed. 150, 160, 75 S.Ct. 127], that "bare figures have a way of acquiring an existence of their own, independent of the evidence which gave rise to them." In view of the complexity of the problem involved in this litigation and the box-car figures which seem to have acquired a being of their own, it would be the easiest course to simply agree with the majority and to join in yielding to the taxpayer the substantial immunity he claims. Unfortunately to adopt that course requires us to embrace the Texas scheme of tax computation in total disdain of this state's apportionment regulation of more than three decades' vintage. I can see no persuasive reason for California to assume such magnanimous self-denial.

I need not repeat the facts, the regulations, or the respective claims of the litigants, since they are adequately related in the text of the majority opinion. I pause merely at the outset to observe that California's procedure for multistate division of the credit differential is entirely consistent with the version recommended to states and approved by the National Conference of Commissioners on Uniform State Laws and the American Bar Association House of Delegates. (Cf. 2 Casner, Estate Planning (3d ed., 1976 supp. to vol. 2) p. 1892.) If adopted by all states, California's apportionment regulation would guard against imposition of combined pick-up and death taxes in excess of the maximum federal credit, for deduction of each state's death taxes from the credit differential, by definition, enables absorption of only a residual credit differential; and percentage apportionment of the residual then prevents decedent's' total tax bill from exceeding the original federal credit.

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

Unfortunately some other states exhibit a pecuniary aggressiveness that causes them to misconstrue the concept of pick-up taxes and, instead of apportioning the credit differential by reference to their respective proportions of federal taxable property or available credit differential, appropriate the entire credit differential without regard to either competing claims of sister states or the independent right of other states to impose their death taxes.

While decedent indisputably resided in California at the time of her death and assets comprising her sizeable estate were almost equally divided between Texas and California, the executor has demonstrated a clear preference for Texas by electing to pay the entire sum of $1,863,291.14 in death and pick-up taxes requested by Texas authorities ($797,826.84 in Texas death taxes plus $1,065,464.30 in additional pick-up taxes) but refusing to remit more than $1,509,279.32 of the $2,007,775.19 in total taxes due California, as claimed by the Controller (all of this state's death taxes but none of the $498,485.87 in pick-up taxes). If the executor had followed the referee's calculation under the regulation, California could have realized its full share of tax revenue while leaving unaffected whatever assessment Texas chose to make against the estate:

| | |
|---|---:|
| California death taxes | $1,509.279.32 |
| Texas death taxes | 797,826.84 |
| Total | $2,307,106.16 |
| | |
| Total federal credit | $3,407,198.33 |
| Less: total death taxes | 2,307,106.16 |
| Available credit differential | $1,100,092.17 |
| | |
| Percent of estate located in Calif. | 45.3131 |
| California share of credit differential | $ 498,485.87 |

Instead, the executor disregarded the above method of calculation and now contends that its California tax liability should amount to no more than the reciprocal share of the federal credit remaining after payment of total taxes charged by Texas authorities ($1,863,291.14) without reference to deduction of either state's death taxes. Thus the executor asks us to embrace the Texas scheme of tax computation and to ignore that adopted by our taxing authority. It is not out of chauvinism that I conclude the California method is equally rational and clearly permissible.

The majority correctly note that there are only three Supreme Court decisions addressing the constitutionality of death or pick-up taxes. In each case in which the court found a constitutional violation, it condemned state law for attempting to impose either a direct or an indirect tax on out-of-state property, thereby denying foreign states the right to collect revenue attributable to property lying within their jurisdictions.

California's regulation, by contrast, specifically eschews any interference with Texas' right to assess and collect the maximum amount of death and pick-up taxes allowed under Texas and federal law and thus carefully avoids the legal pitfalls of an attempted tax on either out-of-state property or revenue attributable thereto. Accordingly, the leitmotif of the three high court decisions that sketch permissible constitutional boundaries for death and pick-up taxation furnishes persuasive support for sustaining the California regulation.

The first opinion was *Maxwell* v. *Bugbee* (1919) 250 U.S. 525 [63 L.Ed. 1124, 40 S.Ct. 2], in which the court upheld a New Jersey death tax that took into account the full value of a nonresident decedent's multistate assets for determining New Jersey death tax rates. Rejecting the contention that this method of computing the tax resulted in a deprivation of property without due process of law "because it in effect taxes property beyond the jurisdiction of the State" (*id.,* at p. 539 [63 L.Ed. at p. 1131]), *Bugbee* approved a rule that permits states to set death tax rates reflective of decedent's total estate, wherever situated and irrespective of actual jurisdiction to tax.

Six years later, in *Frick* v. *Pennsylvania* (1925) 268 U.S. 473 [69 L.Ed. 1058, 45 S.Ct. 603, 42 A.L.R. 316], the high court invalidated the portion of Pennsylvania's death tax law that sought to impose exactions directly on tangible property, the largest part of which consisted of a New York art collection. The court held that "while a State may so shape its tax laws to reach every object which is under its jurisdiction it cannot give them any extraterritorial operation." (*Id.,* at p. 489 [69 L.Ed. at p. 1062].) *Frick* thus emphasizes that a *direct* tax on out-of-state personal and real property constitutes a reach of constitutionally impermissible dimension.

California's regulation, when evaluated in light of *Frick,* must be viewed as steering a course entirely clear of extraterritorial overreaching. Neither on its face nor as applied by the Controller does the regulation purport to exact taxes from property in Texas. On the contrary, the

regulation's pick-up authority is expressly limited to "an amount which bears the same *ratio* to the difference between the total of taxes imposed by all of the states and the maximum state tax credit as the net value of *property subject to the Inheritance Tax Laws of this State* bears to the net value of property subject to the inheritance tax laws of all the states." (Italics added.) (Cal. Admin. Code, tit. 18, §§ 13441-13442.) By taxing no more of the credit differential than can be linked directly to decedent's California estate assets, our regulation transcends the narrow objective of simply avoiding extraterritorial taxation condemned by *Frick* and serves as an inherent guard against infringement of death or pick-up taxes assessed by Texas.

The executor here relies almost exclusively on the third high court case: *Treichler* v. *Wisconsin* (1949) 338 U.S. 251 [94 L.Ed. 37, 70 S.Ct. 1]. He argues that our regulation manifests the same constitutional vice as Wisconsin's emergency tax, namely, an alleged *indirect* tax on tangible property located out of state. In reality, however, calculation of California's pick-up and Wisconsin's emergency taxes differ in three critical aspects. And while only one such difference formed the basis for invalidation of Wisconsin's levy in *Treichler,* all three illustrate ways in which our regulation assures a fairer, more meticulously apportioned determination of pick-up tax than does Wisconsin's emergency formula.

California's regulation restricts this state's share of the credit differential to the apportioned 45.3131 percent of decedent's estate represented by California assets; we also subtract out all other states' death taxes. In marked contrast, the Wisconsin emergency tax involves a failing of this precise restriction. In *Treichler* decedent's estate consisted of 87.52 percent assets subject to Wisconsin taxing authority and 12.48 percent taxable in Florida and Illinois. Oblivious to the need for apportionment, however, the emergency tax allowed Wisconsin to pick up 100 percent of the federal credit remaining after deduction of Florida and Illinois death taxes—thus including a credit differential properly belonging to Florida and Illinois—and thereby forcing an *indirect* tax on foreign state property. Affirming the *Frick* rule that states may neither directly nor indirectly tax tangible out-of-state property, *Treichler* likened *Frick's* illicit death tax to Wisconsin's emergency tax: "Wisconsin's statute may be more sophisticated than Pennsylvania's, but in terms of ultimate consequences this case and the *Frick* case are one. It is quite unnecessary to know in either case what property is located within the taxing jurisdiction in order to compute the challenged exaction." (*Id.,* at p. 256 [94 L.Ed. at p. 42].)

California's regulation departs markedly from the nonapportioning, pecuniarily acquisitive approach exemplified by the condemned Wisconsin emergency tax. The very essence of our regulation is a strict limitation on pick-up taxation according to the exact percentage of decedent's property located within this state's taxing jurisdiction and a complete deference to both death and pick-up taxes claimed by other jurisdictions. Therefore, unlike *Frick* and *Treichler,* our regulation asserts no direct or indirect claim to death taxes assessed by Texas and leaves totally untouched Texas' 54.6869 percent share of federal credit subject to that state's pick-up authority. Unlike Wisconsin's emergency tax, moreover, our pick-up regulation deducts the full impact of California death taxes prior to calculation; we thus ensure that our own death taxes will be assessed only once. Finally, while Wisconsin's emergency tax required that a flat 30 percent rate be employed, once again heedless to the proportion of estate property subject to tax by that state, our regulation contains no fixed percentages that disregard out-of-state property.

In the years since *Treichler* the high court has not issued a single decision dealing with the constitutionality of death or pick-up taxes challenged for their jurisdictional reach. Several opinions addressing the constitutional imposition of state use and gross receipts taxes, however, provide a clear indication that contemporary judicial tolerance for the jurisdictional reach of state taxation is considerably broader than in 1949 when *Treichler* was decided. (See, e.g., *Complete Auto Transit, Inc.* v. *Brady* (1977) 430 U.S. 274 [51 L.Ed.2d 326, 97 S.Ct. 1076]; *Scripto* v. *Carson* (1960) 362 U.S. 207 [4 L.Ed.2d 54, 80 S.Ct. 52]; *Standard Steel Co.* v. *Wash. Revenue Dept.* (1975) 419 U.S. 560 [42 L.Ed.2d 719, 95 S.Ct. 706]; for the California approach, see *Sea-Land Service, Inc.* v. *County of Alameda* (1974) 12 Cal.3d 772, 781-788 [117 Cal.Rptr. 448, 528 P.2d 56].) This unmistakable trend of tolerance for state taxation serves to emphasize the weak foundation upon which *Treichler* rests.

As I have indicated above, the instant matter is readily distinguishable from *Treichler,* but even if not, that case may not be read to undermine in any way the California regulation's constitutional reach. Even if the majority's interpretation of *Treichler* were convincing, there is sufficient doubt of *Treichler's* continued vitality to render its precedential value very slight. Certainly it should not control our determination of the validity of a regulation of this state that has survived more than three decades.

Basically the executor complains of California's comparatively larger total tax bill notwithstanding Texas jurisdiction over a greater proportion of decedent's total estate. He overlooks the underlying reason: Texas residents enjoy a death tax rate considerably lower than the prevailing California rate. (Compare Rev. & Tax. Code, §§ 13404-13406 with Tex. Tax-Gen. Ann., arts. 14.02-14.06, and art. 14.12, subd. (D) (Vernon).) Due to the sizeable variation in death tax rates, California's smaller share of the credit differential ($498,485.87 versus $1,065,464.30 for Texas), while reflecting a perfectly apportioned share of estate assets wholly within this state's jurisdiction, nevertheless fails to offset the larger combined death and pick-up tax burden assessed by California ($2,007,775.19 versus $1,863,291.14 for Texas).

Ignoring the independent legitimacy of California entitlement to assess death and other taxes on in-state property at whatever nonconfiscatory rate is desired (see, e.g., *Estate of Good* (1963) 213 Cal.App.2d 45, 48-50 [28 Cal.Rptr. 378]; *Pittsburgh* v. *Alco Parking Corp.* (1974) 417 U.S. 369, 373-378 [41 L.Ed.2d 132, 136-139, 94 S.Ct. 2291]), the executor lumps together death and pick-up taxes for purposes of interstate comparison, discovers that total taxes in California ($2,007,765.19) slightly surpass the total in Texas ($1,863,291.14), and concludes that section 2011 of the Internal Revenue Code of 1954 constitutionally prevents California from levying taxes of more than 45.3131 percent of the entire federal credit. The conclusion is entirely unfounded, for the federal government under section 2011 in no way attempts to influence the rate or application of California death taxes. Death taxes remain purely within the discretion of individual states, and the federal credit statute does no more than encourage states to pick up the maximum amount of federal estate tax dollars returnable under its aegis to the state treasury.

The executor next contends that since California's aggregate death and pick-up tax obligation exceeds 45.3131 percent of the federal credit, the regulation operates discriminatorily and actually imposes an unconstitutional tax on part of the estate's Texas assets. Whatever inequality occurs in the system, however, derives from factors extraneous to the operation of the California regulation and owes its existence to accepted legal rules. In accounting for larger aggregate death and pick-up taxes in this state than in Texas, once again the simple explanation is that California imposes death taxes on assets within its jurisdiction at higher rates than Texas. Case law clearly provides that states have an independent right to a proportionate share of the credit differential irrespective of whether

double or triple payments are thereby mandated. Thus *Estate of Good, supra,* 213 Cal.App.2d 45 and *Estate of Amar* (1967) 255 Cal.App.2d 404 [63 Cal.Rptr. 444], properly spurned due process and equal protection challenges to the pick-up tax and held that estate taxpayers must pay California its full share of the credit differential regardless of whether another taxing entity, such as the federal government, collects the same credit differential, refuses to refund any part of that credit differential to this state or the executor, and thereby forces double or multiple taxation in excess of the calculated credit differential. The United States Treasury, moreover, has accepted the principles of *Good* and *Amar.* (See Rev. Rul. 70-272, 1970-1 Cum. Bull. 187.) That ruling provides that taxation of the same asset by two different states, even if deemed double taxation, qualifies under the federal credit and will be honored by the federal government.

California is therefore empowered, without necessary reliance on any of the regulation's allegedly discriminatory features, to pick up its proportionate 45.3131 percent share of the credit differential and, further, to collect death taxes on estate assets within this state's jurisdiction at higher rates than Texas imposes on property subject to its jurisdiction.

The executor's characterization of the regulation as discriminatory, therefore, disregards this state's recognized, autonomous rights and misdirects responsibility for multistate discrepancies.[1] Ascribing blame for such discrepancies to incomplete federal credit provisions that fail to apportion at the federal level, the Florida Supreme Court observed: "[T]he defect is in the federal law which does not require the proper allotment of the credit as between the states having taxable interest in the property belonging to the estate of a particular decedent." (*Green* v. *State* (Fla. 1964) 166 So.2d 585, 590.) In my opinion the regulation operates free of discriminatory shortcomings and in furtherance of the state's revenue-generating interest.

Lastly and as somewhat of an afterthought, the executor maintains that the regulation constitutes an improper delegation of administrative authority. Statutory delegation of authority in the present case confers

---

[1]As stated in the context of death taxation by the high court in *Bugbee,* "inequalities that result not from hostile discrimination, but occasionally and incidentally in the application of a system that is not arbitrary in its classification, are not sufficient to defeat the law." (*Maxwell* v. *Bugbee, supra,* 250 U.S. 525, 543 [63 L.Ed. 1124, 1133]; accord, *Estate of Good, supra,* 213 Cal.App.2d 45, 52; see also *Sea-Land Service, Inc.* v. *County of Alameda, supra,* 12 Cal.3d 772, 780.)

upon the Controller a broad grant of power to *issue, administer, and enforce* death and pick-up tax regulations. Specifically, Revenue and Taxation Code section 14740 provides that "The Controller may make and enforce rules and regulations relating to the administration and enforcement of [death and pick-up taxes], and may prescribe the extent, if any, to which any ruling or regulation shall be applied without retroactive effect."

The Controller responds that the regulation furthers equitable administration and enforcement of the pick-up tax in two distinct ways: (1) it respects other states' death taxes by subtracting out their full amounts *before* seeking to retain any portion of the federal credit, and (2) it promotes equality by apportioning the credit differential according to the percentage of decedent's property subject to each state's jurisdiction. Thus, years prior to *Treichler* and the uniform act, the Controller perceptively anticipated the future direction in the death tax field and structured California's system accordingly. The Controller could and did reasonably conclude, as early as 1945, that the Legislature's unambiguous grant of administration, enforcement, and prescription power over pick-up tax rules and regulations justifiably warranted adoption of the regulation to promote its objectives of deference and equitable apportionment. The regulation, therefore, should be sustained as a reasonable delegation of authority.

Finally, we must ascertain whether the regulation is "reasonably necessary." In so doing this court should defer to the agency's expertise and refuse to "superimpose its own policy judgment upon the agency in the absence of an arbitrary and capricious decision." (*Pitts* v. *Perluss* (1962) 58 Cal.2d 824, 832 [27 Cal.Rptr. 19, 377 P.2d 83]; accord, *Morris* v. *Williams* (1967) 67 Cal.2d 733, 749 [63 Cal.Rptr. 689, 433 P.2d 697]; *Agricultural Labor Relations Board* v. *Superior Court* (1976) 16 Cal.3d 392, 441 [128 Cal.Rptr. 183, 546 P.2d 687], app. dism. (1976) 429 U.S. 802 [50 L.Ed.2d 63, 97 S.Ct. 33, 34].) Nor, in passing judgment on the Controller's decision to adopt the particular regulation under challenge, may we consider the possible sagacity or superiority of alternatives: "[T]his court does not inquire whether, if it had power to draft the regulation, it would have adopted some method or formula other than that promulgated by the [agency]. The court does not substitute its judgment for that of the administrative body." (*Pitts* v. *Perluss, supra,* 58 Cal.2d 824, 834-835.) Thus we must not venture to speculate, for example, on the economic advisability or purported advantages of an apportionment formula that calculates this state's share of the federal

credit on a gross rather than net basis. To undertake the task of second-guessing the Controller would exceed the bounds of judicial propriety, frustrate the legislative policy of reliance upon the special competence of an administrative agency, and transgress our narrow function of determining only whether the Controller employs a reasonable, nonarbitrary method to further the administrative purpose. (See *Ralph's Grocery Co.* v. *Reimel* (1968) 69 Cal.2d 172, 180 [70 Cal.Rptr. 407, 444 P.2d 79].)

In sum I cannot agree that the Controller's decision to use a regulation that encourages equitable apportionment and total noninterference with sister state death tax exactions is arbitrary or capricious in violation of what constitutes "reasonable necessity." If anything the regulation makes an uncommon attempt to achieve both deference and equity in an arena often identified as rife with tax-gathering aggressiveness and chauvinism. It deserves to be sustained.

I would reverse the trial court's order and reinstate the tax referee's determination requiring the executor to pay the Controller $498,485.87 in delinquent taxes.